SkeltoN, Judge,
delivered the opinion of the court:
The plaintiff, Earl N. Davis, filed this suit as Trustee of Astrotherm Corporation, a bankrupt corporation of Indiana, hereinafter called “Astrotherm”, for damages for the alleged *22 breach of three contracts by the United States. The facts giving rise to plaintiff’s suit are as follows:
Astrotherm was awarded two contracts by the United States Navy in June of 1958 and May of 1959 for the construction of wing tanks, one contract being in the amount of $896,394.75 and the other for $755,331. These wing tanks were to be delivered in monthly increments from February 1959 to May 1960. On December 6, 1960, the Signal Supply Agency of the Department of the Army of the United States, hereinafter called “Army” awarded a contract to Astrotherm for the manufacture and delivery of generator sets for the contract price of $1,344,769.50.
Each of the three contracts contained standard clauses relating to default, termination for the convenience of the Government and disputes. The provisions relating to progress payments contained in the Army contract provided in part as follows:
(c) Reduction or Suspension. The Contracting Officer may reduce or suspend progress payments, or liquidate them at a rate higher than the percentage stated in (b) above, or both, whenever he finds upon substantial evidence that the Contractor (i) has. failed to comply with any material requirement of this contract, (li) has so failed to make progress, or is in such unsatisfactory financial condition, as to endanger performance of this contract, (iii) has allocated inventory to this contract substantially exceeding reasonable requirements, (iv) is incurring costs whether or not of the kinds eligible for progress payments under paragraph (a) (1) above, which are higher than the respective estimated costs used for establishing the liquidation percentage in paragraph (b) above, (v) is delinquent in payment of the costs or performance of this contract in the ordinary course of business, or (vi) has so failed to make progress that the unliquidated progress payments exceed the fair value of the work accomplished on the undelivered portion of this contract.[1] [Emphasis supplied.]
*23 Astrotherm began work on the Navy contracts and started making delivery of the wing tanks as required by such contracts. The Navy and the Army began making progress payments to Astrotherm on all three contracts as required by their provisions. However, in June 1961, the Army received Dun and Bradstreet reports that two suits had been filed against Astrotherm for nonpayment of debts which indicated that in one of the suits it was alleged that Astro-therm was insolvent or in danger of insolvency and that the appointment of a receiver had been requested. On July 7, 1961, the contracting officer of the Army requested a meeting with Astrotherm on July 13,1961, to discuss its financial status. In the meantime, the Army held up progress payment No. 10 pending investigation of the financial condition of the company.
At the meeting between representatives of the Army, including the contracting officer, and Astrotherm on July 13, 1961, the Army learned that a substantial portion of the inventory of the company represented claims which it had against the Navy which had been pending for a year. It was further learned that the contractor contemplated a loss of at least $36,000 on the Army contract. A memorandum of *24 Ibis meeting was written which shows that the meeting was called to determine whether or not the contractor would be able to complete the Army contract in accordance with its terms. It further appeared that the contractor was having difficulty getting its creditors to grant extensions of time for payment of amounts due them. It was indicated that there was some doubt whether the contractor could collect its claims against the Navy because of the length of time they had been in existence. The company was told that progress payment No. 10 was being withheld and that subsequent progress payments would also be withheld until the company furnished information to the Army that its financial position was such as to warrant further advancement of progress payments.
On August 1, 1961, another meeting was called between representatives of the Army and the president and other officers of Astrotherm to discuss the latter’s financial condition. At the meeting various documents were submitted, examined, and discussed, including a balance sheet, a profit and loss statement, a cash flow statement, and a statement of inventory. The data submitted by the company as to its financial situation was generally unsatisfactory, and the Army’s contracting officer advised the company that approval of additional progress payments would be withheld until the company furnished all requested financial data and adequate assurance of technical competency, together with adjusted amounts applicable to individual progress payment documents.
On August 22,1961, General Charles S. Hays, Commanding General of the United States Army? Signal Supply Agency wrote a letter to the Chief Signal Officer of the Department of the Army regarding the financial condition of Astrotherm in which he pointed out that this company would sustain an estimated loss on the Navy contracts of $500,000 and an estimated loss on the Army contract of $100,000. He stated further that it appeared the contractor would be unable to arrange additional financing in the amount required to complete the contracts at a reasonable interest rate and that if the Army continued to make progress payments as required by the company, at least $500,000 will be out *25 standing by the time the first production shipment was to be made. He recommended that a conference be held by the Army and the Navy to consider an overall method of special financing of the contractor, as the contractor would, no doubt, be forced into bankruptcy if either the Navy or Signal Corps discontinued progress payments before the contracts were completed.
Two conferences were held in Washington, D.C. on August 24,1961, between the Army and Navy personnel to discuss the critical financial condition of Astrotherm and to determine whether or not special financing could be arranged for the company, because without it, the company would no doubt be forced into bankruptcy if either the Army or the Navy discontinued progress payments before completion of their contracts. The first meeting adjourned after all conferees had agreed that the contractor was no doubt insolvent due to accounting methods employed and that further financing would be an extreme calculated risk. At the second meeting on the same day, it was pointed out that if the company’s balance sheet then before the group was properly adjusted, it would no doubt reflect insolvency. It was agreed that both of the contracting officers should visit the company’s plant on August 31, 1961, to try to determine the extent of loss involved and the possibility of the contractor’s being able to obtain additional financing required to complete the contracts, which would be over and above the moneys that the Army and Navy could release under a special arrangement. Representatives of the Army, including the contracting officer, took the position at the meeting that even if the Army and the Navy could advance 100 per cent of the amount of their contracts, the contractor was in no position to furnish the additional financing required to complete the contracts. The thought was expressed at the meeting by representatives of the Army that the contractor was using progress payments from the Army to finance the loss under the Navy contracts. Also, it was stated at the meeting that since the Navy contracts were to be phased out before the company was required to start delivery under the Army contract, there was a danger that the contractor would not have money available to perform the Army contract.
*26 Meetings were held at Astrotherm’s plant on August 30 and 81, 1961, attended by representatives of the Army and the Navy and the president and other officers of the company. At this meeting the financial condition of the contractor was discussed and it was generally agreed that there would be a loss of approximately $500,000 on the two Navy contracts. It was stated that the contractor’s only hope of completing the Navy contracts would be if the Navy advanced the balance of $235,000 plus an advance of about $200,000 against the contractor’s claims if that was at all possible. It was recommended that a representative of the Navy or the Signal Corps make all payments to assure that funds advanced were applied only to Government contracts, and that an Army representative should see that all funds paid by the Army were applied to the Army contract.
Two meetings were held by Army and Navy personnel on September 18, 1961, to discuss the suspension of progress payments on the Army and Navy contracts with Astrotherm. The first meeting was held among Army personnel including the contracting officer. At that meeting it was agreed that progress payments from the Army would be discontinued unless the Navy could make available to the contractor a minimum of $140,000. This figure represents $235,000, which is the contractual balance due on the Navy contract, and an amount of approximately $205,000 in settlement of the contractor’s claims which had been projected by the contractor at a figure of $490,000. It was agreed that if the Navy did not make this money available, then the Army’s position was clear that it would not authorize any further progress payments. The second meeting was held on the same day between Army and Navy personnel for further discussion of Astrotherm’s financial condition. At this meeting it was stated that as a result of an investigation at the contractor’s plant in August and September it would incur a minimum loss of $500,000 if it completed the two Navy contracts and a substantial loss on the Army contract. The contractor had no assured source of additional financing unless the Army and Navy continued to make progress payments. It appeared that there was no possible way for the contractor to complete all of the contracts and absorb a total loss which *27 would approximate $700,000, especially in view of the fact that the contractor’s working capital and net worth had been absorbed and eliminated through the disallowance of claims by the Navy which were carried as a current asset under inventory in an amount of approximately $600,000. At this meeting one of the conferees stated that in his opinion it was a hopeless case and that the contractor should be left to his own devices to furnish the capital needed in order to put the company in a solvent position and insure its ability to furnish the sums of money necessary to complete performance of the contracts over and above that which could properly be furnished under the provisions of the contracts. The meeting was adjourned with the understanding that both the Army and the Navy would advance no further moneys under the progress payment articles. However, it was pointed out at the meeting that the Navy had stopped advancing progress payment money during the month of June and the contractor had stopped production completely on the Navy contracts about a month before the meeting. It was apparent that the contractor obtained as much money as possible from the Navy and then discontinued production. The Army felt that it would be in the same position if it continued to make progress payments, especially in light of the fact that a minimum of $500,000 would be advanced by the Army prior to the time the contractor would make its first shipment. This assumption was, of course, based upon the ability of Astrotherm to keep its creditors in line and stay in business during that period.
On September 21, 1961, Astrotherm’s financial condition was so critical that it entered into a written agreement with its creditors wherein the creditors extended to the company additional time for the payment of their claims “in order to permit debtor to rehabilitate itself and to continue operations under the supervision of a creditor’s committee.” By the terms of this agreement, the business of the company was turned over to a designated creditor’s committee and the time for the payment of the bills of. the company was extended as provided in the agreement and the creditors agreed to accept pro rata payments. It was provided that in the event the company failed to perform its obligations under the agree *28 ment, the creditor’s committee would have the right to liquidate the business of the company through a court proceeding or otherwise.
It should be pointed out that the contracting officer of the Army was present in person or by a representative at all of the above-mentioned meetings and discussions and had full knowledge of Astrotherm’s unstable financial condition during the time the meetings and investigations were going on.
In the meantime, progress payment No. 10, which had been held up by the Army, was paid to Astrotherm to keep it in operation. Thereafter, during the investigations mentioned above, the Army withheld payment of progress payments 11 through 14, but in order to keep the company from going bankrupt, eventually paid all of such payments. In due time the company presented progress payment No. 15 to the Army for payment. On September 21,1961, which was the same date that Astrotherm appointed a creditor’s committee to take over the management of its business and make payment to its creditors, the contracting officer of. the Army wrote Astrotherm the following letter:
This is to acknowledge receipt of your submission of Progress Payment Bequest No. 15, applicable to Order No. 4184 — PP-61-A1-51, Contract No. DA-86-039-SC-87906.
It is advised that based on a review of your financial status, the mentioned Progress Payment request and any request made subsequently will be withheld pursuant to paragraph (c) of the Progress Payments provision of the contract. This suspension will remain effective until the contractor’s financial condition is proven adequate in accordance with the cited contractual provision or the contractor furnishes satisfactory evidence that financial resources are available to assure completion of the performance of the contractual requirements.
For the reasons cited above, Progress Payment request No. 15 is returned.
After receiving this letter, Astrotherm was unable to obtain other financing with which to continue the performance of the Army and Navy contracts. On January 6, 1962, the Navy terminated both of its contracts with the company pursuant to their default provisions. On January 18, 1962, the plaintiff, Earl N. Davis, was appointed trustee of Astrotherm *29 Corporation in a bankruptcy proceeding in the United States District Court for the Second District of Indiana. The plaintiff did not do any work on the Army contract because of the lack of financing to do so, although he continued the operation of the business for about six months after his appointment. After that time he closed the plant and liquidated the business of the company. On June 1, 1962, the Army terminated its contract with Astrotherm in accordance with its default provisions.
The plaintiff appealed the termination of the two Navy contracts and the Army contract to the Armed Services Board of Contract Appeals (hereinafter called the “Board”) pursuant to the provisions of the disputes clause of each contract. The Board consolidated the cases and heard them together. At the hearing before the Board, the above facts relating to the financial condition of the company, the meetings, investigations, negotiations and actions taken were fully presented to the Board and considered by it. On November 30, 1965, the Board entered its decision in the case. In its opinion, the Board considered and relied on the above-detailed evidence in the case and held that the contracting officer made a written finding pursuant to the regulations that under subparagraph (c) of the provisions of the contract dealing with reduction or suspension of progress payments Astrotherm was in such unsatisfactory financial condition as to endanger performance of the contract by writing the letter of suspension of September 21,1961. The Board also found that there was substantial evidence before the contracting officer to support his finding at the time he made it.
Thereafter, the plaintiff filed a motion for reconsideration with the Board acknowledging that the Board’s findings with regard to the actions of the Navy in terminating its two contracts was supported by substantial evidence, but contending that the findings of the Board in regard to the action of the contracting officer of the Army was not supported by substantial evidence. This action by the plaintiff removes the Navy contracts from the case and they will not be involved further in this opinion except insofar as they may relate to what was done with reference to the Army contract. *30 The Board in reaffirming its initial decision on plaintiff’s motion for reconsideration approved the action of the contracting officer in terminating the progress payments.
Thereafter, the plaintiff filed suit in this court alleging that the suspension of the progress payments by the contracting officer of the Army was a breach of contract which was an excusable delay under the default provisions of the two Navy contracts and of the Army contract and that the subsequent terminations of all three contracts by the defendant was for the convenience of the Government and that the defendant should be liable in damages to the plaintiff in the sum of $235,000 on the two Navy contracts and in the sum of $190,000 on the Army contract, all in the total sum of $425,000 for the recovery of which plaintiff filed this suit.
As a basis for his claim for damages, the plaintiff makes the following contentions in this court:
1. The contracting officer did not make a finding in writing as required by the contract and by the Armed Services Procurement Regulations that any of the six conditions existed as set forth in subparagraph (c) of paragraph 59 of the contract dealing with suspension of progress payments;
2. If the contracting officer made such a finding in writing, there was no substantial evidence before him at the time he made it which supported the finding; and
3. There was no substantial evidence before the Armed Services Board of Contract Appeals to support its finding that the contracting officer made a finding, in writing, as required by the contract and by the Armed Services Procurement Regulations that Astrotherm was in such unsatisfactory financial condition as to endanger performance of the contract and that there was substantial evidence before the contracting officer to support such finding by him at the time he made it.
This is a unique case because it involves a contractual provision which enables the contracting officer to act only when substantial evidence exists for his intended course of action.[2]
*31 We focus our attention first upon the finding of the Board that the contracting officer’s letter of September 21, 1961, constituted a finding of fact pursuant to the contract provisions and applicable regulations.
What constitutes a finding of fact is a legal inquiry. Repeatedly, this court has held that it may freely reexamine questions of law as their determination by the Board is not binding upon the plaintiff nor binding upon this court. E.g., Natus Corp. v. United States, 178 Ct. Cl. 1, 3-4, 371 F. 2d 450, 453 (1967). That we may substitute our judgment for that of the Board on this question is of but academic importance here as we sustain its decision.
In resolving the dispute between the parties that a finding was or was not made we must explore the province of the word “finds” as it is used in the relevant paragraph of the progress payments article to determine the duty of the contracting officer thereunder. Only then can we decide whether or not he fulfilled his obligation under that paragraph.
We believe that the contracting officer “finds” a cause for suspension much in the same manner as a jury “finds” for one party or the other. It is a conclusion by way of reasonable inference from the evidence. In other words, we can interpose the word “concludes” for the word “finds” and accurately describe the duty of the contracting officer without changing the substance of the paragraph in the least. The contracting officer must merely conclude that one of the required conditions is present before he may cut off a payment, and this conclusion must rest upon a firm foundation.
Just as a jury need not list the evidence it relied upon, neither does the contracting officer have to detail nor list the evidence before him, nor set forth each and every subsidiary factual determination that led to his ultimate factual conclusion. It is sufficient if he reaches a conclusion and communicates it to the contractor. It is for the courts to apply the proper legal standard in assessing the merits of the conclusion reached whether it be of a jury, or as here, of a contracting officer.
The question here is whether the contracting officer came to the conclusion or found that the plaintiff was in such an *32 unsatisfactory financial condition as to endanger performance of the contract.[3] We find that he did.
In view of the background of previously related conversations and correspondence with the plaintiff that precipitated the letter in question, it is unnecessary to impose the requirement that the contracting officer parrot back one of the six enumerated subsections of the paragraph, permitting suspension, as a basis for his action. It is sufficient if, as here, his finding substantially complies with the subsection on which it is based.
The Army had informed plaintiff in unmistakable terms of its concern as to the firm’s financial ability to continue with performance. We have no douibt that plaintiff was amply on notice of the Army’s fear that Astrotherm’s financial condition was so unsatisfactory as to endanger performance of the contract. The letter expressly based the action of the contracting officer on a review of the firm’s financial status. As the Board stated:
This letter obviously served the purpose of the required written finding and its substance, would not have been altered in the least had the words been inserted, “I find that your firm is in such unsatisfactory financial condition as to endanger performance of the contract.”
We next turn our attention to the plaintiff’s attack on the Board’s finding that the decision of the contracting officer was based upon substantial evidence before him.
The requirement that substantial evidence be present before the contracting officer may properly suspend progress payments indicates that we should briefly mention the method of review practiced by boards generally. The substantial evidence test is not one ordinarily employed by boards in making de novo factual determinations. Besolution of factual disputes is made by them under the standard disputes clause on the basis of a preponderance of the evidence before them without regard to what evidence was before the contracting officer. Newport News Shipbuilding *33 & Dry Dock Co. v. United States, 179 Ct. Cl. 97, 114, 374 F. 2d 516, 530 (1967). It is in the course of judicial review by this court that the substantial evidence test is applied to the administrative record supporting a board’s decision.
We find that the evidence outlined earlier fully complied with the requirements prescribed by the regulation, supra, that discussion be had with the contractor, that there be full exploration of the contractor’s financial condition including existing or available credit arrangements, projected cash requirements, and the effect of progress payment reduction on the contractor’s operations, and that the general equities of the case be considered.
Plaintiff has maintained that the Board was not free to form an independent judgment on the matter but was limited solely to the question of whether the contracting officer had substantial evidence before him to support his finding that a ground for suspension existed.
We not only feel that the Board’s decision as set forth above, was based upon substantial evidence — that is, that a reasonable man could have reached the same decision arrived at by the administrative agency pursuant to a review of the entire record, Midwest Spray & Coating Co. v. United States, 176 Ct. Cl. 1331, 1333 (1966)-but also that such decision was correct.[4] Therefore, even if plaintiff’s view is correct that the Board could not form an independent judgment sustaining the contracting officer by a de novo consideration of the facts, it can only be characterized as nonprejudicial or harmless error in the present case. Cf. Spector v. United States, 165 Ct. Cl. 33, 40 (1964), cert. denied, 379 U.S. 966 (1965); Putschoegl v. United States, 165 Ct. Cl. 65, 75 (1964).
One more observation should be made before we leave this issue. As the Board noted, there was not, as there could not be, evidence to support a finding that plaintiff in fact would or would not be able to complete its contract at the time prog *34 ress payments were suspended. In the absence of some independent showing of impossibility, the gift of prophecy would be necessary to forecast the events of the future with accuracy. But based upon all that was before them, the contracting officer and those present at the meetings and conferences were of the opinion that a realistic and reasonably foreseeable danger threatened the performance of the contract. The opinions of these competent persons constitute evidence for the purpose of applying the substantial evidence test. Bristol-Myers Co. v. Federal Trade Comm'n, 185 F. 2d 58, 62 (4th Cir. 1950).
In conclusion, the Board’s determination that plaintiff’s default was not excusable within the meaning of paragraph 11(c) precludes the operation of paragraph 11(e), and the contract, therefore, cannot be considered to have been terminated for the convenience of the Government.[5] H & H Mfg. Co. v. United States, 168 Ct. Cl. 813, 880-81 (1964).
*35 To the contrary, the evidence shows that the contract was properly terminated for plaintiff’s default.
Accordingly, plaintiff’s motion for summary judgment is denied, defendant’s cross-motion for summary judgment is granted, and plaintiff’s petition is dismissed.
In accordance with the opinion of the court, a memorandum report of the commissioner and a stipulation of the parties, it was ordered on June 23, 1967, that judgment for defendant be entered on its first counterclaim in the amount of $902,141.83 and on its second counterclaim in the amount of $16,752.69, in the total sum of $918,894.52.

 It should be noted that the Armed Services Procurement Regulations governing the procedures of contracting officers under this provision provides in regard to the suspension of progress payments as follows:
“§ 82.93 Suspension or reduction of payments; general.
“In the process of reviewing individual progress payments already existing or hereafter established, action to reduce or slow down progress payments or *23 to Increase liquidation rates (unless justified on other grounds, such as over-payments or unsatisfactory performance) should be consistent with contract provisions, and never taken precipitately or arbitrarily. Any such reduction of progress payments on active contracts (other than normal liquidation pursuant to the contract) should he effected only after notice to and discussion with the contractor, and after full exploration of the contractor’s financial condition, existing or available credit arrangements, projected cash requirements, effect of progress payment reduction on the contractor’s operations, and generally on the equities of the particular situation. Where contract performance is satisfactory, and there is neither overpayment nor anticipated loss, proper progress payments,' adequately verified, will be paid promptly when earned and billed in accordance with contract provisions, even though the terms of the particular contract may make the payment discretionary rather than mandatory, and such proper payments will not be held up or denied because of the contractor’s lack of need for the payment. §§ 82.79-1 (c) and 82.79-2(c) provide that progress payments may be suspended or their rate of liquidation may be increased, whenever any of the circumstances there described are found to exist. The rights reserved to the Government by those paragraphs are for the purpose of protecting the interests of the Government, fostering satisfactory contract performance, and guarding against overpay-ments and losses. Those paragraphs will he administered with these purposes in mind. Action taken pursuant to those paragraphs will be fair and reasonable under the circumstances of particular cases, and supported by substantial evidence. Findings made under those paragraphs will he in writing.” 32 C.F.R. § 82.93 (Supp. 1960) [Emphasis supplied.] This has been carried forward in 32 C.F.R. § 163.93 (1966).

 The plaintiff identifies the provision in controversy as the only one he has knowledge of which imposes the requirement that substantial evidence must be present before the contracting officer may act.

 The defendant suggests that the reguirement that the finding hy the contracting officer be in writing is for the benefit of the Government and that the plaintiff cannot rely upon a deviation from the regulation. We are not inclined to determine that hypothetical issue since if the contracting officer did make a finding it was, in fact, written.

 We do not deal with whether the Board’s determination that substantial evidence existed is a question of law or a question of fact. Neither do we consider whether the Board, if it was limited to a review of the contracting officer’s decision, was also limited to only the consideration of evidence of which the contracting officer was aware. In our opinion the Board considered sufficient evidence, of which the contracting officer was cognizant, to justify its decision.

 The relevant provisions are as follows :
11. Default
*****
(c) Except with respect to defaults of subcontractors, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case the failure to perform must be beyond the control and without the fault or negligence of the Contractor. If the failure to perform is caused by the default of a subcontractor, and if such default arises out of causes beyond the control of both the Contractor and subcontractor, and without the fault or negligence of either of them, the Contractor shall not be liable for any excess costs for failure to perform, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.
*****
(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor or subcontractor pursuant to the provisions of paragraph (c) of this clause, such notice of default shall be deemed to have been issued pursuant to the clause of this contract entitled “Termination for Convenience of the Government,” and the rights and obligations of the parties hereto shall in such event be governed by such clause. {Except as otherwise provided in this contract, this paragraph (e) appUes only if this contract contains such clause.)