MONROE GARMENT COMPANY, INC.

v.

The UNITED STATES.

No. 380–69.

United States Court of Claims.

Dec. 19, 1973.

Edwin J. McDermott, Philadelphia, Pa., attorney of record, for plaintiff.

Lawrence S. Smith, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before LARAMORE and DURFEE, Senior Judges, and NICHOLS, Judge.

## ON DEFENDANT'S MOTION AND PLAINTIFF'S CROSS–MOTION AND MOTION FOR SUMMARY JUDGMENT.

PER CURIAM:

This case comes before the court on plaintiff's request for review by the court of the recommended decision, filed February 26, 1973, by Trial Judge Kenneth R. Harkins pursuant to Rule 166(c). The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the recommended decision of the trial judge, as hereinafter set forth, it hereby affirms and adopts the same us the basis for its judgment in this case. Therefore, defendant's motion for summary judgment is granted, and plaintiff's cross-motion under Rule 163(b) and plaintiff's motion for summary judgment under Rule 101 are denied. Pursuant to Pub.L.No. 92–415 and General Order No. 3 of 1972, this case is remanded to the Armed Services Board of Contract Appeals for further proceedings to determine the amount of any equitable adjustment due to the United States pursuant to the provisions of option 1 of the Supply Warranty clause and for determination of the actual quantities returned to plaintiff in good condition for reworking pursuant to option 4 of the Supply Warranty clause. Counsel for defendant is designated as

the responsible reporting attorney under paragraph 9(a) of General Order No. 3.

## OPINION OF TRIAL JUDGE

HARKINS, Trial Judge:

This is a contract case in which one of the main issues is whether trial of the contractor's claims shall be held administratively or in court. Plaintiff's first amended petition, filed December 8, 1971, subsequent to a hearing by the Armed Services Board of Contract Appeals, asserts that the Wunderlich Act has no application "since the contract provides no remedy to plaintiff for defendant's breach * * *."

The case is before the court on defendant's motion for summary judgment, filed March 7, 1972, and plaintiff's cross-motion and motion for summary judgment, filed May 1, 1972. Both plaintiff and defendant have moved for summary judgment pursuant to Rules 101 and 163(b).

The Armed Services Board of Contract Appeals considered plaintiff's contract claims and rendered its decision on October 28, 1971.[1] Defendant's motion contends that the board's decision disposes of all factual and legal issues involved in plaintiff's claims and requests the court to uphold the finality of the board's decision. Plaintiff, in addition to its claim for breach of contract, asserts that the board's decision is defective within the purview of both sections 1 and 2 of the Wunderlich Act.[2]

Before the board and in this court, the case has been limited to issues of liability. Issues of the quantum of damages that may be owed to plaintiff, if any, and the equitable adjustments due to the Government under the contract remain to be resolved.[3]

Plaintiff does not qualify for a separate judicial trial for breach of contract; all of plaintiff's claims are encompassed in the Disputes clause. The board's findings on factual issues are supported by substantial evidence, and its conclusions on issues of law are correct. Defendant's motion for summary judgment should be allowed, plaintiff's cross-motion and motion should be denied, and the case should be remanded to the board with instructions to determine the equitable adjustments due to the Government in accordance with the terms of the Supply Warranty clause.

This case has had an exceptionally active procedural history, both at the board and in this court. Plaintiff filed its first appeal to the ASBCA on September 8, 1969, and immediately thereafter, on September 15, 1969, filed its petition in this court. Since that time this court on two occasions has ruled on aspects of plaintiff's claims,[4] plaintiff has filed five additional appeals to the ASBCA,[5] and the board has denied plaintiff's motion for a Summary Order (October 30, 1970), conducted a 5-day evidentiary hearing (March 8-11, April 21, 1971), and rendered a decision in detail (October 28, 1971).

Plaintiff's contract, No. DSA 100-68-C-1387, awarded January 16, 1968, provided for the manufacture and delivery of 251,280 men's cotton and polyester tan shirts. The total contract price was

---

1. Monroe Garment Co., ASBCA Nos. 14465, 14882, 14985, 15158, 15189, and 15311, 71-2 BCA ¶ 9142.

2. 68 Stat. 81, 41 U.S.C. §§ 321-322 (1970).

3. On liability, no questions of material fact remain. The board reopened the hearing to permit plaintiff to introduce additional evidence on plaintiff's contention that "* * * there will be no requirement for any evidentiary hearing before the United States Court of Claims should either the appellant or the Government request a factual trial there." 71-2 BCA at 42,392 n. 6.

4. On May 1, 1970, on defendant's motion for summary judgment, this court suspended proceedings in order that the parties could obtain consideration of plaintiff's claims before the board and, on February 2, 1971, upheld the commissioner's order that denied plaintiff's motion to terminate the stay of proceedings in this court after the board had denied plaintiff's motion for a Summary Order.

5. ASBCA No. 14882 (Jan. 23, 1970); No. 14985 (Feb. 26, 1970); No. 15158 (Apr. 13, 1970); No. 15189 (Apr. 20, 1970); and No. 15311 (June 8, 1970).

$530,200.80, made up of cut, make, and trim (CMT) work valued at $236,203.20 and Government-furnished material valued at $293,997.60. Deliveries were to commence in April 1968 and be completed by September 15, 1968.[6]

The contract incorporated Standard Form 32, General Provisions (June 1964 ed.); Additional General Provisions, DSA Form 222 (Nov. 1964 ed.); and Supplemental General Provisions, DPSC Form 502 (May 1966 ed.); accordingly, the then standard articles on Changes, Inspection, and Disputes apply. The contract did not contain a Suspension of Work or comparable article. In addition, the contract included the special Supply Warranty clause on DPSC Form 505 (Oct. 1965). (ASPR 1–324, ASPR 7–105.7(a)(i) and (ii).)

Defense Personnel Support Center's (DPSC) Supply Warranty clause requires the contractor to warrant that the supplies will be free from defects in material or workmanship, will conform with the specification, will be packaged and prepared for shipment, and in other particulars will satisfy all contractual requirements. The contracting officer may give written notice and invoke its provisions within 1 year of the last delivery. Conformance of supplies subject to warranty action "shall be determined in accordance with the applicable sampling procedures contained in the contract." Certain allowances are permitted for grouping of supplies subject to sampling, and sampling results may be projected over supplies not present at the point of reinspection.

Within a reasonable time after invocation of the warranty, the contracting officer may exercise one or more of four options: (1) require an equitable adjustment in the contract price; (2) screen and return all nonconforming supplies for correction or replacement; (3) require the contractor to screen at designated depots and to correct or replace all nonconforming supplies; and (4) return the supplies to the contractor for screening and correction or replacement.

The Supply Warranty clause specifically provides that failure to agree upon any determination to be made under the clause "shall be a dispute concerning a question of fact within the meaning of the 'Disputes' clause."

Plaintiff's performance of this contract was marred by difficulties that resulted in late deliveries and in inferior products. On September 12, 1968, plaintiff was notified that laboratory tests on shirts already delivered indicated that the buckram interlining failed for shrinkage. As a result, in October 1968, after 169,920 shirts had been delivered, plaintiff ceased further production. A new buckram sample passed on December 18, 1968, and the contracting officer on December 30, 1968, notified plaintiff that satisfactory buckram was on hand and could be used.[7]

While the buckram matter was being resolved, the Air Force Services Office in Philadelphia received complaints from Randolph Air Force Base that shirts supplied by plaintiff and by others were defective. On December 5, 1968, DPSC was advised that the Air Force was directing its clothing stores to discontinue issuance or sale of this type shirt, and DPSC was requested to undertake an inspection.

6. The delivery schedule subsequently was amended (PO03, July 10, 1969) to provide for delivery of 177,920 shirts on or before November 30, 1968, with the balance of the 251,280 to be delivered during the period April 29, 1969–July 13, 1969.

7. On September 23, 1969, a contract adjustment was executed to give the Government a price reduction of $1,106.77 to compensate for 44,550 shirts accepted in the supply system with defective buckram. The board's findings of fact 2 through 7 deal with the buckram issue. The board concluded that plaintiff is not entitled to administrative relief under the Changes article insofar as this issue is concerned. Plaintiff acknowledges that defective Buckram was not an issue in the board proceeding. In view of modification PO06, defective buckram is not an issue in this court.

On December 9, 1968, a sample of 80 shirts was inspected at Lackland Air Force Base. The sample was drawn from 46,731 on hand and included shirts from 10 of the 23 lots produced and delivered by plaintiff. This inspection showed that the sample contained 16 major defects, 151 minor A defects, and 15 minor B defects.[8]

On December 12, 1968, the Quality Control Specialist also examined, at Randolph Air Force Base, Texas, 20 shirts randomly selected from six lots that totaled approximately 500 shirts on hand. These 20 shirts were found to contain one major defect and 11 minor A defects.

On December 30, 1968, the contracting officer notified plaintiff that the provisions of the Supply Warranty clause were being invoked on the 177,920 shirts involved in partial shipments 1 through 20. Warranty was said to be invoked "as a result of the numerous complaints and the nonacceptance by the using services" of plaintiff's shirts. A total of 41 types of defects that involved appearance, serviceability, or workmanship were listed as having been found in an investigation of these complaints. Plaintiff was notified that the sample shirts used in the inspection were available for examination, and was requested to visit the center for this purpose. At this time, 177,920 units had been shipped, and plaintiff had been paid for every shirt delivered. The contracting officer warned that the Default article could be invoked.[9]

Plaintiff's president on January 6, 1969, examined 20 of the 80 shirts that the Quality Control Specialist had brought back from the Lackland Air Force Base inspection. Plaintiff's presi-

---

8. MIL–S–4956C(USAF) (Jan. 28, 1966), the shirt specification, establishes quality assurance controls. Types of defects for numerous components and operations in shirt manufacture are identified and classified in tabular form. Classifications of defects in the tables are defined as follows:

"*4.2.2 *Examination of end item.* The defects found during examination shall be classified in accordance with 4.2.2.1, 4.2.2.2, and 4.2.2.3. Defects marked with an asterisk (*) in the classification column shall be classified as major defects when affecting appearance or serviceability seriously and as minor A defects when affecting appearance but not seriously or when slightly limiting serviceability."

General defects are set forth in 4.2.2.1 and are described as follows:

"1. MATERIAL DEFECTS AND WORKMANSHIP DAMAGES. Material defects and workmanship damages shall be classified as minor A or major defects, as indicated by asterisks, only when the condition is one that definitely weakens the structure of the shirt or when it is so conspicuously located as to be clearly noticeable. Material defects, when the condition is nonweakening, shall be classified as no defect. Workmanship damages, when the condition is nonweakening, shall be classified as minor B defects."

9. The December 30, 1968, letter in part stated:

"In accordance with Article 11(a)(ii) of the General Provisions entitled 'Default',

you are required to cure your failure to manufacture in accordance with the terms of above-numbered contract so as not to endanger performance. If you fail to take such action to cure your failure within ten (10) days after receipt of this letter, your contract may be subject to termination for default. You are requested to advise the undersigned of the action you have taken within the above-specified ten (10) days after receipt of this letter.

"You are hereby notified that you must be able to demonstrate to the Government that you can manufacture an acceptable end item. In the event you state you can cure and deliver an acceptable end item, technical representatives from this center will visit your facilities after the specified ten (10) day period in order to verify that the aforementioned can be accomplished by your firm. If you are not in a position to cure your failure, please notify me within the ten (10) day period. Also, in such event, you are afforded an opportunity to show cause why the Government should not, by written notice of default, terminate this contract. Any facts bearing on this question should be presented in writing to this office within ten (10) days after receipt of this letter. Your failure to reply within this time may be considered as an admission that no excuse exists. Your attention is invited to the rights of the Government under the 'Default' Article and your contractual liabilities in the event a decision is made to terminate for default."

dent acknowledged that some of the claimed defects were present, did not agree that all of the shirts were bad, but raised no major disagreement with the inspection results. Plaintiff's president believed the time lapse since the first shipment was unfair and that the deficiencies could have been corrected had the Government inspector not accepted the shirts on delivery.

On February 13, 1969, plaintiff presented for evaluation five shirts produced in a normal production run, which, subject to correction of a poorly shaped pocket flap, were considered acceptable. As a result, default action was not instituted and plaintiff was informed that the Government would permit continued production under the contract.

On March 7, 1969, after production resumed, a quality assurance conference was held at plaintiff's plant and, on March 19, a pilot lot of 50 shirts was presented, not for acceptance or rejection, but for a quality assurance evaluation. In early April 1969, after a period of adjustment, full production with improved quality was resumed with lot 24.

On April 14, 1969, DPSC personnel met to consider complaints from plaintiff's counsel that the invocation of warranty under the Supply Warranty clause was legally insufficient because improper procedures had been utilized in the selection of the sample of 80 shirts at Lackland Air Force Base. Defendant's representatives at this meeting reached the conclusion that, notwithstanding the type and number of defects found in the sample, the 80 units inspected had not been selected in accordance with the quantity required for sampling under the contract and as a result "could not legally be used in the exercising of the Supply Warranty on subject contract." Defendant's representatives therefore concluded it was advisable to select a new sample from available supplies and to conduct a second inspection within the 1-year time period of the Supply Warranty clause. Inasmuch as 177,920

shirts were involved in warranty action, the sample size was determined to be 500 shirts. This second inspection was conducted at DPSC on May 21–22–23, 1969.

The sample was selected at random from quantities on hand at Lackland Air Force Base, Memphis Depot, and at DPSC from a total of 11 separate production lots. The board found the sample reasonably representative of the quantity involved in warranty action.

The sampling procedures specified for inspections under this contract provide for successive inspections of three differently sized parts of the sample, with different types of defects scored on each part of the sample. At the second inspection, the first part sample (32 shirts) was examined for total defects (major, minor A, and minor B combined). In these 32 shirts, up to 21 such defects could be permitted under the contract. Inspection disclosed 117 such defects in plaintiff's 32 shirts. The second part sample (80 shirts) was inspected for major and minor A defects combined, and up to 21 such defects could be permitted under the contract. Inspection disclosed 300 such defects in plaintiff's 80 shirts. The 500-shirt sample was examined for major defects only. Up to 21 major defects could be permitted under the contract. Inspection disclosed 97 major defects in plaintiff's 500 shirts.

By July 30, 1969, plaintiff had made final shipment of shirts not involved in warranty action. A total of 247,840 shirts were delivered under the contract: 177,920 shirts initially delivered and subject to warranty, plus 69,920 shirts delivered in the period April–July 1969, after production resumed. During the period June–July 1969, defendant returned to plaintiff for reworking shirts that had been withdrawn from storage and supply channels. The actual quantities returned for reworking, as well as the extent of shirts in damaged condition, are matters not resolved by the

board and remain for subsequent negotiation or determination.[10]

On November 17, 1969, plaintiff submitted for reinspection a reworked lot of 8,080 shirts. This lot was rejected for excessive defects in all categories and was later included in the two lots resubmitted for inspection in spring 1970.

On December 29, 1969, the contracting officer formally notified plaintiff of the results of the second inspection that had been conducted on May 21–23, 1969. The contracting officer asserted that the second inspection "* * * without doubt, confirmed the findings of nonconformance discovered on the first warranty inspection." Plaintiff was given the following notice:

> Due to the results of the above inspection, I find the defects listed above to be of a workmanship nature and properly scoreable rather than in a judgment area. On the basis of the second warranty inspection, you are again given notice of nonconformance under the Warranty Clause in above-numbered contract covering 177,920 units contained in Partials 1 thru 20. However, as stated in my letter of December 22, 1969, the option quantity totals are changed from 73,306 each under Option #4 to 72,363 each and the 104,611 each under Option #1 is changed to 105,526 each.

In 1970 two lots of shirts were submitted for reinspection, and both were rejected. On reinspection, a "tightened" procedure is required.

On March 18–19–20, 1970, a lot consisting of 30,040 shirts was reinspected. Sample sizes for this lot were 32, 80, and 315 shirts. The 32-shirt part sample that was examined for total defects (major, minor A, and minor B combined) had an acceptance number of 18 such defects. There were 40 such defects in plaintiff's 32 shirts. The 80-shirt part sample examined for major and minor A defects combined could have up to 18 such defects. There were 87 such defects in plaintiff's 80 shirts. The 315-shirt sample that was examined for major defects only could have up to 12 major defects. There were 72 major defects in plaintiff's 315 shirts.

On April 28–29–30, 1970, a lot of 38,040 shirts was reinspected. Sample sizes for this lot were 32, 80, and 500 shirts. The 32-shirt part sample examined for total defects (major, minor A, and minor B combined) had an acceptance number of up to 18 such defects. There were 61 such defects. The 80-shirt part sample examined for major and minor A defects combined had an acceptance number of up to 18 defects. There were 137 such defects. The 500-shirt sample examined for major defects only had an acceptance number of 18 defects. There were 172 such major defects in plaintiff's 500 shirts in this sample.

The board's findings of fact as to the results of inspection and reinspection of samples of plaintiff's 177,920 shirts subject to warranty action show that plaintiff's performance of a contract to manufacture shirts clearly was deficient. In such circumstances, unless the sampling procedures specified were erroneously applied or unless the contract was breached by defendant's failure to comply with procedural requirements, plaintiff should not be permitted to prolong litigation by pursuit of legal niceties.

Plaintiff's principal contention throughout has been that the claims do not arise "under the contract," and that its remedy is a trial de novo to collect delay damages for defendant's breach of the Supply Warranty clause. Plaintiff relies upon Edward R. Marden Corp. v.

10. On August 11, 1969, plaintiff was requested to submit an offer for an equitable adjustment in contract price for the shirts subject to option 1 (104,560 shirts) and a delivery schedule for return of shirts included in option 4 (73,630 shirts). On December 29, 1969, the contracting officer stated 105,526 shirts were subject to option 1 and 72,363 shirts were subject to option 4. Plaintiff has not submitted offers and the contracting officer has not made a unilateral determination thereon.

United States[11] and Len Co. & Associates v. United States [12] for the contention that the Supply Warranty clause fails to provide plaintiff a specific equitable adjustment for damages that were occasioned by improper invocation of the warranty procedures. The contractual provisions involved in both *Marden* and *Len* are distinguishable from the provisions of the Supply Warranty clause. *Marden* involved a cardinal change that placed the Government's requirements beyond the scope of the contract under the Changes article. For that reason, no equitable adjustment specifically was provided in the contract. In *Len,* the Changes article and Inspection article were specially drawn and, by their terms, did not authorize specific equitable adjustments to be granted. The Inspection article in *Len* was found not to encompass an equitable adjustment if "in fact, the additional work proves not to be required" because its function was to authorize an inspection procedure to insure satisfactory and timely compliance by the contractor.[13]

The court observed in *Len* that there was no indication in the special Inspection article "that the parties sought to provide an administrative remedy for violation by the Government of its requirements, compelling additional work." [14] This observation provides some support for plaintiff's contention that the provisions of the Supply Warranty clause are similarly defective. The Supply Warranty clause, however, differs in that it specifically provides to the Government equitable adjustments in four options that include price and services. Further, all determinations that are made under the clause are subject to the "Disputes" article.

The Supreme Court and this court have confirmed that contracting parties have power to provide for administrative determination of disputes arising incident to contract performance, and by appropriate provision to convert breach of contract claims to claims cognizable under the contract.[15]

In this contract, plaintiff agreed to submit all disputes over determinations made under the Supply Warranty clause to initial agency decision.

The board was given jurisdiction to decide the factual issues involved in disputes over defects in material and workmanship in shirts supplied by plaintiff, disputes over the contracting officer's invocation of warranty, disputes over size and selection of inspection samples, and disputes over any equitable adjustment due to defendant. In short, the board was authorized to decide all factual issues involved in plaintiff's appeal.

Administrative findings made within the overriding requirements of the Wunderlich Act on factual issues relevant to questions arising under the contract are final and conclusive on the parties for all purposes. Finality of findings of fact authorized by the contract to be administratively made, if sufficiently supported, cannot be avoided in a court action for the same relief by asserting that the primary issue involved is a question of law.[16]

Where a claim is cognizable under the contract, the administrative procedure must be followed, regardless of whether the dispute in the particular instance concerns issues of law, issues of fact, or both.[17] Plaintiff's claims, insofar as the disputes concerned determinations made under the Supply Warranty

11. 442 F.2d 364, 194 Ct.Cl. 799 (1971).

12. 385 F.2d 438, 181 Ct.Cl. 29 (1967).

13. Len Co. & Associates v. United States, *supra* note 12, 385 F.2d at 451–452, 181 Ct. Cl. at 51–52.

14. *Id.,* 385 F.2d at 452, 181 Ct.Cl. at 52.

15. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d

642 (1966) ; Len Co. & Associates v. United States, *supra* note 12, 385 F.2d at 441, 181 Ct.Cl. at 36.

16. United States v. Utah Constr. & Mining Co., *supra* note 15, 384 U.S. at 418–422, 86 S.Ct. 1545.

17. Zidell Explorations, Inc. v. United States, 427 F.2d 735, 737, 192 Ct.Cl. 331, 335 (1970).

clause, were cognizable under the contract.

■ Plaintiff's claims were adjustable under the Supply Warranty clause, notwithstanding the absence of an express provision for an equitable adjustment to the contractor in the event warranty invocation was unwarranted. Had the board found that the Government had erroneously invoked warranty because it failed to follow contractually prescribed sampling procedures, an equitable adjustment could have been ordered to compensate plaintiff for rescreening and repairing shirts under the option 4 provision in the warranty. The board could have nullified the contracting officer's request for an equitable adjustment in contract price for shirts covered by option 1 of the warranty and the board could have ordered the Government to pay the amounts withheld on partial shipments 21 through 31.

Inasmuch as the contract does not contain a "Suspension of Work" article, plaintiff's delay-damage claim is not encompassed by any contract provision and is not redressable under the contract. Factors underlying this claim, however, are resolved by the board's findings. The board's action is integral to plaintiff's claim and must be accorded recognition.[18]

The basis for plaintiff's delay-damage claim would be a finding that the Government improperly invoked the Supply Warranty clause or exercised the options available thereunder after an unreasonable delay. The board, after hearing extensive evidence, found these elements to be absent.

From the inception of this litigation, plaintiff has characterized its claim, at least in part, as one for delay damages for which no contractual remedy was provided. This is not a case wherein plaintiff has argued before the board without reservation and is later estopped from arguing that the necessary determinations are outside the board's jurisdiction.[19]

■ In its decision, in addition to making findings as to the specific facts involved in plaintiff's contract performance, the board interpreted the specifications of the contract and the requirements of its various provisions. The board's findings on these matters involved interpretations of questions of law. The board's interpretations of the contract specifications, or its findings on questions of law, are not final, and this court may come to contrary conclusions, if merited. The board's interpretations of the contract provisions, however, are correct and must stand.

Plaintiff contends that the board misconstrued the inspection requirements specified in the shirt specification and the procedures required by the sampling standard that were incorporated into the contract.[20] Plaintiff interprets these documents to require inspection of an 800-unit sample when the lot includes 177,920 shirts. The board decided the contract required a 500-shirt sample for a lot of that size. In addition to the question of the size of the sample required by the contract, plaintiff disputes the board's findings as to the number of shirts that actually were included in the sample at the second inspection. Plaintiff contends that there were more than 500 and perhaps as many as 637 shirts inspected in the May 21–23, 1969, inspection of the 177,920 lot.

Plaintiff's contract, by appropriate reference, incorporated the shirt specifi-

18. Nager Elec. Co. v. United States, 368 F. 2d 847, 859, 177 Ct.Cl. 234, 251 (1966).

19. United States v. Hamden Co-Operative Creamery Co., 297 F.2d 130 (2d Cir. 1961) ; Fishel Prods. Co. v. Commodity Credit Corp., 415 F.2d 1255 (9th Cir. 1969), cert. denied, 397 U.S. 962, 90 S.Ct. 995, 25 L.Ed.2d 254 (1970).

20. MIL–S–4956C (USAF) (Jan. 28, 1966), Military Specification for "Shirt, Man's, Cotton-Polyester, Tan, Summer Service"; MIL–STD–105D (Apr. 29, 1963), Military Standard for "Sampling Procedures and Tables for Inspection by Attributes."

cation (MIL–S–4956C(USAF)) and the standard for inspection by sampling (MIL–STD–105D). Quality assurance provisions in the shirt specification, in paragraph 4.2, provides that inspection shall be in accordance with MIL–STD–105D and in paragraph 4.2.2.4 establishes acceptable quality levels (AQL's) and inspection levels. The AQL's, expressed as the number of defects per 100 units (applicable to inspection for general defects as listed in paragraph 4.2.2.1 and for detailed defects as listed in paragraph 4.2.2.2), were established at 2.5 for major defects, 15.0 for major and minor A defects combined, and 40.0 for total major, minor A, and minor B defects combined. Inspection levels are expressed in roman numerals, and for plaintiff's contract inspection level "II" was specified.

MIL–STD–105D was published April 29, 1963, to provide sampling procedures and reference tables for use in planning and conducting inspection by attributes.[21] The sampling standard classifies defects, defined as "any nonconformance * * * with specified requirements [2.1]," according to seriousness, i. e., as critical, major, or minor. Defects applicable to shirts made by plaintiff would be classified either "major" or "minor."[22] A "major" defect includes a defect other than critical that is likely to "result in failure, or to reduce materially the usability of the unit [2.1.2]." A "minor" defect is a defect that is not likely "to reduce materially the usability of the unit" or is a departure from established standards that has "little bearing on the effective use or operation of the unit [2.1.3]."

Detailed instructions are provided in the sampling standard for drawing samples (para. 7) and for the procedures to be followed in "normal," "tightened," and "reduced" inspections (para. 8). Paragraph 9 of the sampling standard instructs on the selection of a sampling plan, for use at a designated inspection level. The inspection level determines the relationship between the lot or batch size and the sample size and is prescribed by the responsible procuring authority, normally at one of three levels —I, II, and III. Unless otherwise specified, inspection level II is used. Additional "special" inspection levels, to be used where relatively small sample sizes are necessary and large sampling risks must be tolerated, also are provided.

The procedure established in the sampling standard directs Table I to be used to find the applicable code letter that designates a sample size for particular sized lots at a prescribed inspection level. The lot or batch size involved in the warranty action relative to plaintiff's shirts was 177,920. Table I for this sized lot designates the letter "P" as the applicable code letter at general inspection level II.

Tables II, III, or IV in the sampling standard are used to obtain the sampling plan that applies to a particular inspection through the use of the AQL specified in the shirt specification and the code letter that is obtained from Table I. In the event no sampling plan is provided for a given combination of AQL and code letter, instructions on the table direct the user to a different sampling plan.[23]

21. MIL–STD–105D was developed by a working group that represented the military services of Canada, the United Kingdom, and the United States, and had assistance and cooperation from American and European quality control organizations. This standard has an international designation, ABC–STD–105.

22. A "critical" defect would likely "result in hazardous or unsafe conditions" or "prevent performance of the tactical function of a major end item such as a ship, aircraft, tank, missile or space vehicle. [2.1.1.]"

23. The sampling standard provides:
"9.4 OBTAINING SAMPLING PLAN. The AQL and the code letter shall be used to obtain the sampling plan from Tables II, III or IV. When no sampling plan is available for a given combination of AQL and code letter, the tables direct the user to a different letter. The sample size to be used is given by the new code letter not by the original letter. * * *"

Table II covers single sampling plans and is the table that applies to the warranty action on plaintiff's contract. Table II has three parts: II–A gives sampling plans for normal inspection; II–B, for tightened inspection; and II–C, for reduced inspection.

The shirt specification in plaintiff's contract provides AQL's of 2.5, 15.0, and 40.0 Table II–A gives the following sampling plans for these AQL's: AQL 2.5 (major defects), the sample size is 500, the acceptance number is 21, and rejection number is 22; AQL 15.0 (major and minor A defects combined), the sample size is 80, the acceptance number is 21, and the rejection number is 22; AQL 40.0 (total major, minor A, and minor B defects), the sample size is 32, the acceptance number is 21, and the rejection number is 22.[24] To summarize, the sampling plans established by Table II–A for the AQL's specified in plaintiff's contract contain three sample sizes: 32, 80, and 500 units, each with an acceptance number of 21 and a rejection number of 22.

Plaintiff contends that MIL–STD–105D is ambiguous in its instructions for the selection of applicable sampling plans. This contention is frivolous. An experienced supplier should have no difficulty in understanding the procedures therein provided for selection of quality assurance samples.

The procedure to be followed once a sampling plan has been obtained from Table II–A is simple. First, a sample of 500 shirts is drawn at random. The investigation then proceeds through successive examinations for the types of defects related to the respective AQL's. In the first part of the sample all classes of defects, major, minor A, and minor B, are sought. Successive parts are examined for fewer types of defects; but the defect involved increases in seriousness. In the last part of the sample, only major defects are scored.

The inspector first looks at 32 shirts, the sample for AQL 40.0. The small number of shirts in this sample are given a comprehensive inspection that includes major, minor A, and minor B defects. If such defects reach the rejection number, 22, or more, the entire lot may be rejected. If such defects equal or are less than the acceptance number, 21, an additional 48 shirts are examined. This brings the number to the 80 units specified for AQL 15.0. The additional 48 shirts are examined only for major defects and minor A defects. In the event there are 22 such defects, the rejection number is reached and the entire lot may be rejected. If there are 21 (the acceptance number), or fewer, such defects found, the inspector selects 420 additional shirts, the remainder of the 500-unit sample that is prescribed for AQL 2.5. The remaining shirts are examined only for major defects. If such defects in the 500-unit sample equal or exceed the rejection number, 22, the entire lot may be rejected. In the event, however, 21 or less major defects are found in this inspection, the entire lot is acceptable.

The board's analysis of the shirt specification and of the sampling standard produced the same results as the foregoing. As a matter of law, the board was correct in its interpretation of the contract provisions applicable to sampling inspection procedures.[25] The inspection on May 21–22–23, 1969, of the 500-shirt sample was conducted in accordance with the sampling plan designated on Table II–A of the sampling standard. This inspection is described in board

24. Plaintiff's confusion as to the applicable sample size for AQL 2.5 results from a failure to correctly follow instructions on the use of Table II–A. Such instructions are quoted above from paragraph 9.4. The sample size on Table II–A directly opposite the code letter "P" is 800 units. Inasmuch as under the 2.5 AQL column there is no entry opposite the code letter "P," instructions on Table II–A direct the user to "use first sampling plan above arrow." In this case the first sampling plan provides a sample size of 500 units.

25. Board findings Nos. 17 and 18, 71–2 BCA at 42,386–87.

finding No. 19. The sampling plans therein described correctly apply the contract standards. The sampling plans used on the two lots of shirts submitted for reinspection in spring 1970, both of which lots were rejected, are described in board findings Nos. 25 and 28. The sampling plans there described correctly apply the contract standards.

Plaintiff contends that findings Nos. 15 and 19 that 500 shirts were examined in the May 1969 inspection are inaccurate. Plaintiff contends there were 618 shirts inspected, of which 116 were scored for defects. Plaintiff's contention is not supported by the administrative record.

There are some indications in the administrative record that more than 500 shirts may have been shipped to the DPSC Philadelphia facility in order to make up a 500-unit sample. Finding No. 15, for example, indicates that 360 shirts came from Lackland Air Force Base, 98 shirts from Memphis Depot, and 60 shirts from stocks on hand, a total of 518.

Plaintiff cites other items in the administrative record that indicate more than 500 shirts were identified with the sample. For example, the Disposition Form, dated February 4, 1970, DSA Form 111 (Jan. 1964 ed.), relative to the sample involved in plaintiff's warranty action, recites that "a sample size of 637 shirts" is retained, and that such shirts "are located in building 20 litigation cage." Plaintiff also cites the contracting officer's August 11, 1969, letter concerning the warranty action, in which the contracting officer noted that all units under option 4 had been returned with the "exception of inspection sample size of 618 each" which was "being retained at DPSC Phila."

The foregoing materials cited by plaintiff indicate that there were more than 500 shirts on hand at DPSC, Philadelphia. Shirts had been shipped to

DPSC, Philadelphia, over an extended period of time for various unknown reasons. Reference to these shirts as a "sample size" is unfortunate and is confusing. These references, however, do not establish that the number actually inspected was larger than the 500-unit sample specified in the contract. The inspector's report for the May 21–23 inspection shows, on its face, that the size of the sample to be inspected was 500 for AQL 2.5, that 80 units applied to AQL 15.0, and that 32 units applied to AQL 40.0. The inspector's report is the best evidence available as to the number of shirts actually inspected. Plaintiff, at the hearing, did not introduce evidence or testimony that would establish that more than 500 shirts in fact were inspected, nor did plaintiff challenge the inspector's report in this regard. There is substantial evidence in the administrative record, taken as a whole, to support the board's finding that 500 shirts were inspected at DPSC on May 21–22–23, 1969.

Plaintiff's citations in support of its opposition to the board's finding does not meet the test necessary to overcome the substantial evidence that supports such finding. When the evidence is not overwhelmingly in favor of the opposing view, the view of the facts adopted by the board, if otherwise proper, will be sustained when supported by the evidence.[26]

■ On May 25, 1972, plaintiff was permitted to file an affidavit in support of its motion for summary judgment. This affidavit recites that 618 shirts were produced at the Defense Personnel Support Center for examination by a representative of plaintiff. Plaintiff's affidavit does not assert that the sample inspected at the May 1969 inspection exceeded the 500-unit size. An affidavit, of course, may be offered in support of a motion under Rule 101(a) for summary judgment on a cause of action enti-

**26.** Northbridge Electronics, Inc. v. United States, 444 F.2d 1124, 1128–1129, 195 Ct.Cl. 453, 460, 462 (1971) ; Koppers Co. v. United States, 405 F.2d 554, 559, 186 Ct.Cl. 142, 151 (1968).

tled to a trial de novo. Plaintiff's claim for breach of contract, however, has been shown to be unwarranted. The only claim properly before the court is one for review under the Wunderlich Act of the board decision. In such review, the court may only consider evidence presented to the agency and contained in the administrative record.[27] For this reason, the affidavit may not be considered in this proceeding and is treated as stricken from the record.[28]

Plaintiff's principal argument for trial de novo is that defendant's invocation of warranty on December 30, 1968, was a breach of contract because the 80-unit sample inspected was inadequate.

The board treated the December 30, 1968, letter as notice that a warranty problem existed and made no finding upon the question of whether inspection of the 80 units in fact was sufficient to support action under the Supply Warranty clause. Failure of the board to make a finding in this regard does not invalidate its findings on the issue of liability.

The Supply Warranty clause may be invoked at any time "within one year of the last delivery under this contract." Since the last delivery took place on July 30, 1969, defendant had until July 30, 1970, to give written notice of its intention to invoke warranty and to exercise the options available under the Supply Warranty clause. Defendant exercised its options under the Supply Warranty clause after the May 1969 inspection, which fully complied with the requirements of the quality assurance provisions of the contract. Any infirmities that may have existed in the 80-unit sample, and plaintiff has not established in the administrative record that the 80-unit sample in fact was not in compliance with the requirements of the sampling standard, were cured by the second inspection May 21–23, 1969.[29]

Plaintiff argues defendant is bound by the finding of the contracting officer at the April 14, 1969, meeting that the 80-shirt inspection was legally insufficient as a basis for warranty invocation. Any determination as to the required size of the sample involves interpretation of the provisions of the shirt specification and of the sampling standard. Such interpretation involves a question of law, and neither the views of the contracting officer nor the views of the board would be final. With regard to questions of fact, findings by the contracting officer are not necessarily binding upon the board. The board proceeding is de novo, and the board may base its decision on a preponderance of the evidence in its entire record. The board is not limited to evidence before the contracting officer.[30] Conclusions reached by the Government representatives at the April 14, 1969, meeting, expressed in an internal Government record, are not determinative of the adequacy or inadequacy of the size of the sample under the requirements of the contract. The validity of invocation of the provisions of the Supply Warranty clause in this case rests upon the inspection that was accomplished in May 1969.

Plaintiff's amended petition asserts that delay damages in the amount of $124,956.81 were incurred as a result of

27. United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

28. Northbridge Electronics, Inc. v. United States, *supra* note 26, 444 F.2d at 1130, 195 Ct.Cl. at 463.

29. It is probable that inspection of the 80-shirt sample justified rejection of plaintiff's shirts. There were three ALQ's—40.0, 15.0, and 2.5—which would require sampling of 32 shirts, 80 shirts, and 500 shirts, respectively.

In the sampling procedures, rejection of the lot is permitted at any point where inspection showed defects to exceed the acceptable number. For AQL 15.0, the sample was 80 shirts with an acceptance number of 21. Government inspection revealed 151 defects in the 80 shirts.

30. R. E. D. M. Corp. v. Lo Secco, 291 F. Supp. 53 (S.D.N.Y.1968), aff'd, 412 F.2d 303 (2d Cir. 1969); Davis v. United States, 180 Ct.Cl. 20 (1967).

defendant's improper invocation of warranty. Damages claimed are for "increased labor and overhead costs due to the Government's stopping its production and after starting, after such delay, plaintiff incurred make-up pay and high starting costs, with increased overhead, until its production reached the level before its production had been stopped." At no time did the Government issue an order that stopped plaintiff's production.

The September 12, 1968, notice to plaintiff concerning the defective buckram came from the defendant's testing laboratory. It was not a formal order or directive from the contracting officer. The letter, on a form that was customarily used to transmit laboratory verification test results, had blanks for insertion of the appropriate date and a check list to designate the results of the test. This laboratory communication advised plaintiff that—

Government verification and contractor-furnished test results for supplies represented by attached Verification Test Results report dated 10 Sept 68 are noncomparable. Accordingly, for this contract you are hereby notified that you are being placed in a noncomparable status as prescribed in your contract.

By checkmarks in the appropriate boxes, on the form, plaintiff was told that acceptance of future lots "will be deferred pending completion of vertification testing by the Government," and that the supplies represented by the test results "are unacceptable to the Government. End items, already accepted, containing these supplies may be subject to warranty action."

The information in the September 12, 1968, letter was notice that the test results put plaintiff in a "noncomparable" status. It was not an order to cease production.[31] The December 30, 1968, letter to plaintiff from the contracting officer, which notified plaintiff about the results of the 80-unit sample inspection at Lackland Air Force Base, similarly, was not an order to cease production. The December 30, 1968, letter in pertinent part states:

In regard to the Government's verification testing on Buckram Lot # 7 be advised Buckram has passed, however because of the poor workmanship noted on the shirts which were inspected it is suggested you withhold any further cutting until you examine the shirts available at this center as was requested of you.

This letter is not to be construed as an extension, abandonment or waiver of the delivery schedule or a waiver of any of the Government's rights under the terms and provisions of your contract.

The contracting officer's suggestion that plaintiff "withhold any further cutting," in these circumstances, was not an order to stop production. Plaintiff's decision to cease production in September 1968 resulted from plaintiff's consideration of the difficulties experienced in meeting contract requirements. Communications from the Government relative to the failure of the buckram to meet specifications and the failure of the completed shirts to satisfy the requirements of the Supply Warranty clause were appropriate to the circumstances.

For all of the foregoing reasons and upon the law and evidence as illustrated by the administrative record, defendant's motion for summary judgment is granted, and plaintiff's cross-motion under Rule 163(b) and plaintiff's motion

31. DSA DPSC–T Manual 4155.3, Quality Systems Requirements (Oct. 15, 1968), states contractor will be placed in a noncomparable status "when the Government determines that it cannot rely on the accuracy of the contractor's inspection results or that it cannot rely on contractor's quality control program." A contractor may be placed in a noncomparable status (1) if Government verification testing does not confirm a contractor's report of visual examination results, (2) if Government verification testing does not confirm contractor's report of testing results, and (3) if after review it is determined that the contractor's quality control program is not reliable.