ASCO–FALCON II SHIPPING COMPANY, et al., Plaintiffs

v.

The UNITED STATES, Defendant.

No. 207–87C.

United States Claims Court.

Oct. 31, 1989.

---

Anne E. Mickey, Washington, D.C., attorney of record, for plaintiffs.

Tamra Phipps, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This is a maritime subsidy case in which three shipping companies (plaintiffs) seek to recover $5,015,996 in alleged breach of contract damages. The April 13, 1987 petition filed herein is premised upon a series of subsidy contracts, described as operating differential subsidy (ODS) agreements and construction differential subsidy (CDS) agreements, executed between the plaintiffs' predecessors in interest and the United States (defendant) under the authority of the Merchant Marine Act of 1936, ch. 858, 49 Stat. 1985 *et seq.*, codified as amended at 46 U.S.C.App. § 1101 *et seq.* (West Supp.1989). The defendant, acting through the Maritime Subsidy Board (MSB) of the Maritime Administration (Marad), Department of Transportation,[1] allegedly breached an implied ODS contract obligation of good faith and fair dealing when it allegedly failed to take timely action on the plaintiffs' application for ODS contract amendments, while at the same time expeditiously granting virtually identical relief to similarly situated subsidized competitors. The plaintiffs advanced the Tucker Act, 28 U.S.C. § 1491, as the requisite basis for jurisdiction in this court. The matter is presently before the court pursuant to the defendant's October 22, 1987 RUSCC 12(b) Motion to Dismiss for lack of subject matter jurisdiction and failure to state a claim, wherein it asserts that the plaintiffs have failed to exhaust mandatory administrative remedies. Oral argument was held on October 12, 1989. For the reasons stated hereinafter, said motion is denied.

*Background*

This case involves the maritime subsidy program developed by the government pursuant to the Merchant Marine Act of 1936, codified as amended at 46 U.S.C.App. § 1101 *et seq.* (West Supp.1989) (the Act). It is the product of congressional concern that vital national security and commercial interests are served by the maintenance of oceangoing vessels under United States registry. Thus, the Act seeks to equalize through subsidies the competitive position of American flag and foreign flag shipowners and operators with respect to vessel construction costs, operating expenses, and foreign subsidies. The concern addressed by the Act was the relative weakness of the American merchant marine, which was somewhat disadvantaged in a competitive marketplace by the lower costs regularly incurred by foreign flag competitors. Accordingly, the Act implements a subsidy program designed to put the owners and operators of American flag vessels in a position of competitive parity. The history of the merchant marine subsidy system has been examined and discussed in extensive detail by both this and our predecessor court. *See Oceanic Steamship Co. v. United States*, 218 Ct.Cl. 87, 93–94, 586 F.2d 774, 777 (1978); *American Export Isbrandtsen Lines, Inc. v. United States*, 204 Ct.Cl. 424, 431–37, 499 F.2d 552, 557–60 (1974); *Moore–McCormack Lines, Inc. v. United States*, 188 Ct.Cl. 644, 649–50, 413 F.2d 568, 570–71 (1969); *Aeron Marine Shipping Co. v. United States*, 10 Cl.Ct. 236, 238–40 (1986); *Newport News Ship-*

---

1. The functions, powers, and duties relevant to this case, formerly vested in the Department of Commerce, were transferred to the Department of Transportation pursuant to Pub.L. No. 97–31, 95 Stat. 161, 46 U.S.C.App. § 1114 (1982). The MSB and Marad, previously within the Department of Commerce, were also transferred to the Department of Transportation. Additionally, the authority vested in the Secretary of the Department of Transportation has been delegated to the MSB and Marad.

*building & Dry Dock v. United States,* 7 Cl.Ct. 549, 551–52 (1985).

*Facts*

The facts set forth below are drawn from the plaintiffs' April 13, 1987 complaint. For the limited purpose of ruling on the defendant's motion to dismiss, which raises jurisdictional questions, we are compelled to accept these undisputed allegations of fact as true and correct. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90, 96 (1974); *Reynolds v. Army and Air Force Exchange Service,* 846 F.2d 746, 747 (Fed.Cir.1988); *Raymark Industries, Inc. v. United States,* 15 Cl.Ct. 334, 335 (1988).

Each of the three plaintiffs herein owns and operates a United States flag, dry bulk cargo vessel [2] of approximately 36,000 deadweight tons (DWT) each. Plaintiff Asco–Falcon II Shipping Company (Asco), a Delaware corporation with its principal place of business located in Houston, Texas, owns and operates the Star of Texas. Plaintiff Equity Carriers I, Inc. (Equity I), a Delaware corporation with its principal place of business located in Houston, Texas, owns and operates the Pride of Texas. Plaintiff Equity Carriers III, Inc. (Equity III), a Delaware corporation with its principal place of business also located in Houston, Texas, owns and operates the Spirit of Texas.

All three vessels (collectively "the Texas Bulkers") were built with construction differential subsidy (CDS) funds.[3] Levingston Falcon I Shipping Company (original shipowner) was the original purchaser of each vessel under CDS agreement MA/MSB–429, which was executed between it and the defendant on October 6, 1978. The defendant simultaneously executed CDS agreement MA/MSB–428 with Levingston Shipbuilding Company (shipyard contractor), wherein it was agreed that the defendant would pay an amount equal to 49.95% of the contract price as the construction differential subsidy. The defendant also agreed to make certain CDS payments to the original shipowner for various other expenses under MA/MSB–429 and MA/MSB–428. Further, under those two CDS agreements, the balance of the contract price was paid by the original shipowner to the shipyard contractor, pursuant to the terms of CDS agreement MA/MSB–427.[4]

With respect to the Star of Texas, Hull No. 752, the original shipowner assigned all of its ownership rights, title, and interests under CDS agreements MA/MSB–429, MA/MSB–428, MA/MSB–427 and the vessel itself to plaintiff Asco on or about June 7, 1979. With respect to the Pride of Texas, Hull No. 751, the original shipowner assigned all ownership rights, title, and interests under those three contracts and the vessel to Asco–Falcon I Shipping Company, which, in turn, made an assignment of all rights, title, and interest in these contracts and the vessel to Hull 75–IRFC/Partnership acting by and through the Connecticut Bank and Trust Company. With respect to the Spirit of Texas, Hull No. 753, the original shipowner assigned all ownership rights, title, and interests under MA/MSB–429, MA/MSB–428, and

---

**2.** Bulk vessels are chartered under contract for specific voyages and carry either (a) commodities in full and complete shipload lots or (b) commodities which are customarily loaded and carried without wrappers or containers and delivered by the carrier without transportation mark or count. *See American Maritime Association v. United States,* 766 F.2d 545, 548 n. 2 (D.C.Cir.1985). Bulk cargo vessels have also been defined as vessels built to carry solid, liquid, or gaseous commodities that in normal shipment are contained only by the vessels' structure. 46 C.F.R. § 252.3(d) (1988).

**3.** CDS is a subsidy whereby the government agrees to shoulder a percentage of the cost of constructing a ship in an American shipyard in accordance with a design and plan approved by the United States Navy. Under the program, the government agrees to pay the difference between the construction cost in an American shipyard and the cost of a similar vessel constructed in a foreign shipyard. 46 U.S.C.App. §§ 1152, 1154 (West Supp.1989). The amount of CDS is, however, limited to no more than 50% of the cost of construction in an American yard. 46 U.S.C.App. § 1152(b) (West Supp. 1989).

**4.** CDS agreements MA/MSB–429, MA/MSB–428, and MA/MSB–427 were not part of the record before the court, but were described in detail in the plaintiffs' complaint.

MA/MSB-427 and the vessel to Asco Falcon III Shipping Company, which, in turn, on or about December 28, 1982, assigned all its rights under the contracts and the vessel to the Connecticut National Bank as trustee. All of these assignments took place with the defendant's unconditional consent.[5] Hull 751–IRFC/Partnership bareboat chartered the Pride of Texas to plaintiff Equity I. The Connecticut National Bank, as trustee, bareboat chartered the Spirit of Texas to plaintiff Equity III. Under the terms of their respective bareboat charter agreements, plaintiffs Equity I and Equity III are the respective owners of the Pride of Texas and Spirit of Texas *pro hac vice*.

Also on October 6, 1978, the defendant executed ODS agreement[6] MA/MSB-439 with Equity Carriers, Inc., the original operator of all three of the Texas Bulkers. In Article I–2(a)[7] of that contract, the vessel operator agreed to operate the Texas Bulkers for at least 335 calendar days per year in an essential service, defined in the contract as the world-wide carriage of dry bulk cargoes in the foreign oceanborne commerce of the United States and in the carriage of such cargoes between foreign ports.[8] This same section simultaneously restricted the operator of the Texas Bulkers from engaging in certain shipping activities. The operator thereby agreed to carry exclusively commercial dry bulk cargoes not subject to the cargo preference statutes of the United States, including, but not limited to, 10 U.S.C. § 2631, 46 U.S.C.App. § 1241, and 15 U.S.C. § 616(a), unless the agencies administering such statutes were to determine that the cargoes involved would otherwise be waived to, or allocated for, foreign flag carriage.

In Article I–2(b),[9] the operator and the defendant agreed to make any changes in the subsidized essential services, as described in Article I–2(a), if the defendant determined that such change would be nec-

---

5. All sales, transfers, and assignments were made only with the defendant's consent. While there is no evidence in the record indicating such consent outside the plaintiffs' allegations to that effect, the defendant does not dispute the truth of these assertions.

6. ODS is defined as the excess of the cost of subsidizable items of expense incurred in the operation under United States registry of a vessel over the estimated fair and reasonable cost of the same items of expense if that vessel were operated under the registry of a foreign country whose vessels are substantial competitors of that vessel. 46 C.F.R. § 252.3(k) (1988). The government subsidy is intended to offset some of the higher operating costs incurred by an American flag vessel due to wages, repairs, maintenance, and insurance. 46 U.S.C.App. § 1173 (West Supp.1989). Thus, an ODS agreement is the contract between the operator and the government which governs the payment of ODS. 46 C.F.R. § 252.3 (1988).

7. Article I–2(a) provides in part:
   During the period of this Agreement, the Operator shall operate the vessels described in Article I–3 [the Texas Bulkers] hereof for a minimum of 335 days per calendar year ... in worldwide carriage of dry bulk cargoes in the foreign oceanborne commerce of the United States and in the carriage of such cargoes between foreign ports; provided that said vessels shall carry exclusively commercial dry bulk cargoes not subject to the cargo preference statutes of the United States including,

but not limited to, 10 U.S.C. 2631, 46 U.S.C. 1241, and 15 U.S.C. 616a, unless the agencies administering such statutes determine that the cargoes involved would be otherwise waived to, or allocated for, foreign flag carriage. ...

8. The Secretary of Transportation has the discretion to consider ODS applications for vessels that are to be engaged in an essential service in the foreign commerce of the United States under 46 U.S.C.App. § 1171 (West Supp.1989). For bulk carrying services, an "essential service" is more thoroughly defined in 46 U.S.C.App. § 1121(b) (West Supp.1989) as "The bulk cargo carrying services that should, for the promotion, development, expansion, and maintenance of the foreign commerce of the United States and for the national defense or other national requirements to be provided by United States-flag vessels...." In this context, "foreign trade" or "foreign commerce" is defined as either trade between the United States and a foreign country or trade between two foreign ports. 46 U.S.C.App. § 1244(a) (West Supp. 1989).

9. Article I–2(b) provides:
   If the Secretary [shall] determine that any change [in] the subsidized essential service(s) described in this Article I–2 is necessary in the accomplishment of the purposes of the Act, he may make such change(s) upon such readjustment of payments to the Operator as shall be arrived at by the method prescribed in section 606(1) of the Act.

essary to accomplish the purposes of the Act. Modifications or amendments to MA/MSB–439 were to be accomplished either—at the request of the operator under Article II–24, upon proof that it was not possible to maintain and operate the Texas Bulkers in the essential services described in Article I–2 without a reasonable profit on the investment, or by mutual consent of the parties, under Article II–25.

On August 3, 1979, Equity Carriers, Inc.[10] applied to Marad for an amendment to Article I–2(a) of ODS agreement MA/MSB–439. This application sought a modification whereby the operator of the Texas Bulkers would be allowed to carry dry bulk preference cargo at world rates.[11] The application made alternative proposals—the first suggesting that the operator should continue to receive ODS payments and the second suggesting that the modification should be granted with an ODS payment suspension. The modifications proposed by the operator were not then permitted by the existing ODS agreement.

Marad, however, informed the operator that the MSB had decided to hold its application in abeyance for a period of one year.[12] The MSB subsequently published notice of the plaintiffs' application for amendment to ODS agreement MA/MSB–439 in the *Federal Register* on June 20, 1980, with comments to be submitted by interested parties no later than July 14, 1980. 45 *Federal Register* 41,689 (June 20, 1980). Comments on the application were received during the summer of 1980, but no further action was taken. On June 27, 1980, Marad informed the plaintiffs that it expected subsidized vessels to continue operation in compliance with the ODS agreement—the carriage of preference cargo at world rates. It further advised that no subsidized vessel would be permitted to engage in the carriage of preference cargo at premium rates with or without ODS payments.[13]

While the operator's application was pending, Congress amended the Merchant Marine Act by enacting what became known as the "Snyder Amendment," 46

10. Equity Carriers, Inc. was the original operator under ODS agreement MA/MSB–439. However, it subsequently assigned all of its rights, titles, and interests to the plaintiffs herein with the defendant's unconditional consent. Thus, each plaintiff assumed all duties and liabilities incumbent upon Equity Carriers, Inc. under the October 6, 1978 ODS agreement. The ODS agreement as it related to the Pride of Texas was assigned to Equity I in May of 1981. While the plaintiffs allege that there was an assignment to Asco with respect to the Star of Texas, and to Equity III with respect to the Spirit of Texas, the record contains no specific evidence as to the date on which these two assignments took place.

11. "World rates" describe the rates at which cargoes are shipped by foreign flag vessels in the world-wide commercial market. This is to be distinguished from United States flag, or "premium" rates, which are described as the fair and reasonable rates received by United States flag vessels. Premium rates can amount to more than twice world rates. *American Maritime Association v. United States,* 766 F.2d 545, 549 (D.C.Cir.1985).

12. Certain allegations of fact by the plaintiffs go to the merits of the breach of contract claim, wherein they allege that the defendant breached an implied obligation of good faith and fair dealing when it failed to act on the amendment application, while granting virtually identical

relief to similarly situated competitors. Thus, certain facts central to the plaintiffs' ultimate assertion of discrimination by the MSB and Marad are included here for the purpose of clarifying the course of events.

In this context, the plaintiffs allege that, during negotiation of ODS agreement MA/MSB–439, the defendant agreed to amend Article I–2 to carry dry bulk preference cargo with ODS if the application of a competitor, then consisting of eight shipping companies referred to as the Berger Group, was granted similar relief. The Berger Group application was granted on June 14, 1979, wherein two of its vessels were given permission to operate in the dry bulk preference trades at world market rates while continuing to receive ODS for an experimental period of one year. This action by the MSB was the ostensible reason for the plaintiffs' August 3, 1979 application. The plaintiffs were allegedly advised by the MSB that no action would be taken on their application until the end of the experimental period. This was the alleged reason for the MSB decision to hold the plaintiffs' application in abeyance.

13. The plaintiffs maintain that the Berger Group was permitted to continue operating its two vessels in the dry bulk preference cargo trades at world rates with the continuing receipt of ODS payments, in spite of this MSB pronouncement.

U.S.C.App. § 1184, in August of 1981.[14] Under that amendment, vessel operators were given the option of making an election whereby they could carry preference cargo at premium rates. Such election was to be premised on a set of conditions whereby the operator would agree to the suspension of ODS payments for at least one year. Further, the operator making the election would be required to repay a portion of CDS payments used in construction of the vessel for which the election was to be made.

Each plaintiff herein, as a result of depressed economic conditions which existed in the shipping industry at that time, elected to operate under the Snyder Amendment. Equity I made that election with respect to the Pride of Texas in September, 1981, while Asco made its Snyder Amendment election for the Star of Texas in December, 1981. By 1982, Equity III was forced to make the same election with respect to the Spirit of Texas when it was delivered from the shipyard. Thus, each of the plaintiffs was making CDS paybacks for the Texas Bulkers under the Snyder Amendment from 1982.

In 1982, representatives of Equity Carriers, Inc. and Asco met with Marad staff and were advised that the Snyder Amendment was the only approach by which subsidized vessels could engage in the preference trades. In reliance on the statements made at this meeting, Equity did not actively pursue its August 3, 1979 ODS amendment application. The plaintiffs continued to operate under the Snyder Amendment until it perceived a Marad policy reversal in late 1983 and early 1984.

On August 31, 1983, the MSB issued a tentative order in response to a remand and order for reconsideration issued by the United States Court of Appeals for the District of Columbia, pursuant to a legal challenge commenced by one of the plaintiffs' competitors in the shipping industry.[15] The tentative order issued by the MSB allowed all of the vessels operated by the plaintiffs' competitor to carry dry bulk preference cargo at premium rates, while continuing to receive ODS payments. This tentative order was adopted in a final opinion on December 23, 1983. In that final opinion, the MSB determined that the Snyder Amendment was not the exclusive method by which a subsidized bulk vessel could participate in the preference trades.

The plaintiffs viewed these events as an approach which was substantially different from prior MSB precedent. Accordingly, the plaintiffs revised their August 3, 1979 amendment application on March 20, 1984. Therein the plaintiffs sought an amendment to ODS agreement MA/MSB–439, Article I–2 which would permit the carriage of preference cargoes at premium rates. They also requested that ODS payment be resumed, with the simultaneous suspension of CDS paybacks required under the Snyder Amendment. This amended application was published for comment in the *Federal Register* on April 5, 1984. 49 *Federal Register* 13,620 (April 5, 1984). No action was taken on this revised application.

---

**14.** 46 U.S.C.App. § 1184 (West Supp.1989) provides in pertinent part that:

(a) Any operator receiving operating differential subsidy funds may elect, for all or a portion of its ships, to suspend its operating differential subsidy contract with all attendant statutory and contractual restrictions ... if—

(1) the vessel is less than ten years of age;

(2) the suspension period is not less than twelve months;

(3) the operator's financial condition is maintained at a level acceptable to the Secretary of Commerce; and

(4) the owner agrees to pay to the Secretary, upon such terms and conditions as he may prescribe, an amount which bears the same proportion to the construction differential subsidy paid by the Secretary as the portion of the suspension period during which the vessel is operated in any preference trade from which a subsidized vessel would otherwise be excluded by law or contract bears to the entire economic life of the vessel.

**15.** The competitor was the Berger Group, *see* note 12. The Berger Group, which operated six vessels, contested the manner in which the MSB had rendered its determination of the world rates to be received by the two vessels it had operated in the dry bulk preference trades since 1979.

Following an MSB decision with respect to yet another subsidized competitor,[16] the plaintiffs again amended their application. On June 7, 1984, the plaintiffs sought MSB permission to use, as a preferred alternative to the March 20, 1984 revised application, to carry civilian dry bulk preference cargo at fair and reasonable rates without ODS payments and without CDS paybacks under the Snyder Amendment. The MSB published notice of this amended application on June 25, 1984, with comments due by July 6, 1984. 49 *Federal Register* 25,913 (June 25, 1984). The MSB then requested a further round of comments by December 7, 1984, after publishing a second notice on November 21, 1984. 49 *Federal Register* 46,000 (November 21, 1984).

The MSB issued a tentative opinion and order with respect to the plaintiffs' June 7, 1984 revised amendment application on September 26, 1985, which granted the requested relief. The order was stayed, pending review of an additional round of comments due October 28, 1985. The MSB issued its final opinion on February 28, 1986, but the order was not effective until April 15, 1986. Thereafter, pursuant to the execution of ODS agreement MA/MSB–439 Addendum No. 11, plaintiffs were relieved from their Snyder Amendment election. They were permitted to carry civilian dry bulk preference cargo at fair and reasonable rates, without any ODS payments. By a letter dated June 25, 1986, plaintiffs informed Marad representatives of their desire to effect a retroactive amendment to ODS agreement MA/MSB–439 and/or the return of the CDS paybacks made under the Snyder Amendment. The defendant issued no formal response to this request. Up to that date the plaintiffs had made Snyder Amendment payments in the following amounts: Asco, $1,473,452; Equity I, $2,686,549; and Equity III, $855,995. The plaintiffs, on April 13, 1987, filed a complaint in this court seeking damages in an aggregate amount equal to the aforementioned CDS paybacks made under the Snyder Amendment. The defendant in its October 22, 1987 RUSCC 12(b) motion to dismiss for lack of subject matter jurisdiction and failure to state a claim alleges that the plaintiffs have failed to exhaust mandatory administrative remedies respecting these claims.

## Contentions of the Parties

### A. Defendant

The defendant contends that, under the Merchant Marine Act of 1936, codified as amended at 46 U.S.C. § 1101 *et seq.*, any disputes concerning ODS and CDS agreements are committed to agency discretion. Thus, the defendant asserts that any claim resulting from either an ODS or a CDS agreement must first be submitted to the MSB for consideration before seeking review in this court. According to the defendant, the plaintiffs have not submitted a proper claim for the refund of their CDS paybacks made under the Snyder Amendment, and as such, have never obtained a final agency decision on the claims. The defendant vociferously argues that compliance with these agency procedures is mandatory in all cases involving ODS and CDS, and that the plaintiffs have failed both to submit a proper claim and to obtain a final agency decision. The defendant, therefore, asserts that this alleged failure to exhaust their administrative remedies deprives this court of jurisdiction to hear the claims under dispute.

### B. Plaintiffs

The plaintiffs, on the other hand, contend that they are not required to exhaust any administrative remedies whatsoever. They further contend that there are no applicable remedies to exhaust, and that, even if

---

**16.** On April 11 and May 24, 1984, the MSB gave Moore–McCormack and other subsidized vessel operators permission to carry military liquid or dry bulk preference cargo at premium rates without ODS, and without the obligation to make CDS paybacks under the Snyder Amendment while under charter to the Military Sealift Command. This relief was granted three months after the amendment application was filed on February 15, 1984. This decision did not explicitly relieve the plaintiffs of their statutory and contractual restrictions because it applied only to military preference cargo, not the civilian dry bulk preference cargo carried by the plaintiffs' vessels.

such procedures existed, exhaustion would be inadequate and futile. Instead, the plaintiffs allege that the defendant breached an implied obligation of good faith and fair dealing when it failed to consider their ODS amendment applications *in a timely manner*, causing them to erroneously pay back CDS amounts previously made by defendant. This alleged breach, according to the plaintiffs, obviates any requirement to submit a claim to the MSB. Rather, the plaintiffs assert that a breach of contract claim provides them with direct access to this court under the Tucker Act, 28 U.S.C. § 1491.

*Discussion*

■ The sole issue for decision here is whether the plaintiffs may seek direct access to this court under the Tucker Act, 28 U.S.C. § 1491.[17] As we observed in *Gregory Lumber Co., Inc. v. United States*, 9 Cl.Ct. 503 (1986), *see Gregory Lumber Co., Inc. v. United States*, 11 Cl.Ct. 489 (1986) (same case), *aff'd* 831 F.2d 305 (Fed.Cir. 1987), *cert. denied*, 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988), the initial jurisdictional inquiry under the Tucker Act must focus upon whether the claim in issue is one which may be characterized as arising under the contract or a breach of contract claim. *Id.* at 517, *citing Monroe Garment Co., Inc. v. United States*, 203 Ct.Cl. 324, 488 F.2d 989 (1973). While the difference between the two is not a substantive distinction, it determines both the availability of direct access to the Claims Court and the scope of review. *Gregory Lumber*, 9 Cl.Ct. at 517. A claim arises under the contract *if* complete relief is available under a specific provision in the contract. *Id., citing Edward R. Marden Corp. v. United States*, 194 Ct.Cl. 799, 804–05, 442 F.2d 364, 366–67 (1971). In such circumstance, a plaintiff will be *required* to exhaust all administrative remedies before seeking review in the Claims Court. At that point, the scope of judicial review of a claim arising under the contract will be conducted according to the standards set forth in the Wunderlich Act, 41 U.S.C. §§ 321–322.

That review will be strictly limited to the record established in the administrative proceedings below. *Gregory Lumber*, 9 Cl.Ct. at 517 (citations omitted).

However, if the relief sought may be properly termed a breach claim, the plaintiff is entitled to direct access in this court under the Tucker Act. *Id.* (citations omitted). If no specific contract provision contemplates complete relief for an alleged deviation from the contract, a breach claim exists. Whether a claim satisfies the test for a breach claim depends not only upon the existence of a specific clause, but upon the language and intent of that clause. *Id., citing Len Co. & Associates v. U.S.*, 181 Ct.Cl. 29, 39, 385 F.2d 438, 444 (1967). In other words, a breach claim is one where complete relief is not available under the contract through reasonable interpretation, either in the form of an equitable adjustment or by a constructive change pursuant to any appropriate contract clause. This is a narrow inquiry, the failure of which will automatically result in *de novo* review in this court should the plaintiff choose to pursue direct access under the Tucker Act. This is so even in those cases where the claim arises out of a contractual provision which specifies the rights and obligations of an aggrieved party, but does not authorize the relief sought through the explicit terms of that provision. *Id.* 385 F.2d at 518.

■ We believe that the principles relative to Tucker Act jurisdiction enunciated in *Gregory Lumber*, and the cases cited therein, are equally applicable to this maritime subsidy contract dispute. Against this background, it is clear that the plaintiffs' claim that the defendant breached its implied obligation of good faith and fair dealing must be characterized as a breach claim. As such, the plaintiffs are entitled to both direct access and *de novo* review in this court under the Tucker Act. At the outset, we observe that the obligation of good faith and fair dealing is a covenant which is implied in this and every contract. *Travelers Indemnity Co. v. United States,*

---

17. Both parties agree that shipping subsidy contracts are not within the ambit of the Contract Disputes Act. *See e.g., Newport News Shipbuild-* *ing & Dry Dock v. United States*, 7 Cl.Ct. 549, 552–53 (1985). As such, jurisdiction, if it exists, must be established under the Tucker Act.

16 Cl.Ct. 142, 149 (1988), *citing Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1152 (D.C.Cir. 1984); Williston, *A Treatise on the Law of Contracts,* § 670 (3d ed. 1961). Thus, the government has an ever present obligation to perform its duties under a contract reasonably and in good faith. *Commerce International Co., Inc. v. United States,* 167 Ct.Cl. 529, 536, 338 F.2d 81 (1964).

A close examination of ODS agreement MA/MSB–439 discloses no contract provision governing the availability of relief in the event of a breach of good faith. Moreover, there is no specific provision governing the type of relief sought here—a claim for the return or refund of CDS paybacks made pursuant to the Snyder Amendment. Thus, under no reasonable interpretation of the contract may the plaintiffs' claim be viewed as a claim arising under the contract. As such, even if given the opportunity to rule on the claims presented here, the MSB itself would be without jurisdiction to "fashion a remedy for the plaintiff[s]." *Gregory Lumber,* 9 Cl.Ct. at 518. In view of the foregoing, we are compelled to conclude, without any further examination of contract language or intent, that the defendant's alleged breach of the obligation of good faith and fair dealing must be viewed as a breach claim pursuant to the analysis set forth in *Gregory Lumber* and the cases cited therein. The plaintiffs are thus properly before this court under the Tucker Act.

*Conclusion*

The defendant's RUSCC 12(b) motion to dismiss for lack of subject matter jurisdiction and failure to state a claim is hereby DENIED. No costs. A status conference shall be held at 10:00 a.m., Monday, November 13, 1989, at the National Courts Building. The exact courtroom location will be posted in the lobby at that time. The parties shall be prepared at that time to advise the court how they now intend to proceed in this case.

IT IS SO ORDERED.