ASCO–FALCON II SHIPPING
COMPANY, et al.,
Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 207–87C.

United States Court of Federal Claims.

Dec. 21, 1994.

Anne E. Mickey, Washington, DC, attorney of record for plaintiffs.

John E. Kosloske, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant.*

*OPINION*

REGINALD W. GIBSON, Judge:

INTRODUCTION

In this maritime subsidy case,[1] plaintiffs

---

\* Mr. Kosloske became counsel of record for defendant on August 26, 1994. Phyllis Jo Baunach was counsel of record for defendant at the time the parties briefed the motions that are the subject of this opinion.

1. This case involves, in substance, the maritime subsidy program developed by the federal government pursuant to the Merchant Marine Act of 1936, codified as amended at 46 U.S.C.App. § 1101 *et seq.* (1988). Under that program, American flag shipping operators and shipbuilders receive competitive federal subsidies for construction costs and operating expenses. The goal of the program is to put American shippers in competitive parity with foreign flag vessels in order to strengthen the American merchant marine. The history of the merchant marine subsidy system has been discussed extensively by both

are three [2] shipping companies who are seeking to recover approximately $5 million in damages for an alleged breach of contract. The contract upon which plaintiffs bring suit herein is an operating differential subsidy (ODS) agreement entered into between the United States and Equity Carriers, Inc., plaintiffs' predecessor in interest. In that connection, plaintiffs allege that defendant breached its contractual duties by failing to act upon their application for an amendment to the ODS agreement for an unreasonably long time and by expeditiously granting the applications of other similarly situated shippers while simultaneously taking no timely action on plaintiffs' application. In addition to opposing said allegations, the United States has also counter-claimed plaintiffs for amounts allegedly owed by them to the government under the Snyder Amendment.[3] 46 U.S.C.App. § 1184 (1988). Previously, in *Asco–Falcon II Shipping Co., et al. v. United States*, 18 Cl.Ct. 484 (1989), this court denied defendant's motion to dismiss for lack of subject matter jurisdiction, premised on the alleged failure of plaintiffs to exhaust mandatory administrative remedies. Presently, this matter is before the court on Plaintiffs' Motion for Summary Judgment, as well as Defendant's Motion to Dismiss or in the Alternative for Summary Judgment. After careful consideration of the contentions and arguments of the parties as contained in the motions and briefs submitted to the court, we conclude that defendant's motion to dismiss must be granted because the complaint fails to state a claim upon which relief can be granted. Therefore, plaintiffs' motion for summary judgment must be denied. Moreover, we hold that defendant is entitled to judgment on its counterclaim as a matter of law based on the stipulated facts, and, accordingly, defendant's motion for summary judgment on the counterclaim is granted.

## FACTS

The facts relevant to the disposition of this matter were set out at length and in detail in our earlier opinion. *Asco–Falcon*, 18 Cl.Ct. at 486–90. However, for the convenience of the reader, we briefly summarize the material facts of this case.

Each of the three plaintiffs in this action is the operator of a U.S.–flag dry bulk cargo vessel of approximately 36,500 deadweight tons. Asco–Falcon II Shipping Co. (Asco) operates the Star of Texas; Equity Carriers I, Inc. (Equity I) operates the Pride of Texas; and Equity Carriers III, Inc. (Equity III) operates the Spirit of Texas. Collectively, these vessels are known as "the Texas Bulkers." All three vessels were constructed, pursuant to contracts with the Maritime Administration (MarAd), with construction differential subsidies (CDS). These payments to the shipbuilder by the federal government are designed to cover the excess cost of construction in a U.S. shipyard as compared to comparable costs in a foreign shipyard, thereby encouraging the use of U.S. shipbuilders.

On October 6, 1978, Equity Carriers, Inc. (Equity Carriers), the original operator of the Texas Bulkers, entered into an operating differential subsidy agreement, known as Contract No. MA/MSB–439, for a 20–year term with the United States, represented by the Secretary of Commerce,[4] acting by and

---

this and our predecessor court. *See Oceanic S.S. Co. v. United States*, 586 F.2d 774, 777, 218 Ct.Cl. 87 (1978); *American Export Isbrandtsen Lines, Inc. v. United States*, 499 F.2d 552, 557–60, 204 Ct.Cl. 424 (1974); *Moore–McCormack Lines, Inc. v. United States*, 413 F.2d 568, 570–71, 188 Ct.Cl. 644 (1969); *Aeron Marine Shipping Co. v. United States*, 10 Cl.Ct. 236, 238–40 (1986); *Newport News Shipbuilding & Dry Dock v. United States*, 7 Cl.Ct. 549, 551–52 (1985).

2. They are Asco–Falcon II Shipping Company, Equity Carriers I, Inc., and Equity Carriers III, Inc.

3. Enacted in August 1981, the Snyder Amendment provided that subsidized vessels would be allowed to carry preference cargoes provided they made certain payments to the government. Plaintiffs elected to operate under this provision, and the United States contends that it is still owed payments thereunder from the plaintiffs. *See* the "Facts" section, *infra*, at pp. 598–99.

4. The functions, powers, and duties relevant to this case, formerly vested in the Department of Commerce, were transferred to the Department of Transportation (DOT) pursuant to Pub.L. No. 97–31, 95 Stat. 161, 46 U.S.C.App. § 1114 (1988). MarAd and the Maritime Subsidy Board, previously within the Commerce Department, were moved to the DOT, and have been

through MarAd's Maritime Subsidy Board (MSB or the Board). Under said agreement, defendant agreed to compensate the vessel operator for the excess cost of, *inter alia*, operating the vessels under U.S. registry and with American crews over the estimated operating expenses if the vessels were under the registry of a foreign country whose vessels are substantial competitors of the vessels covered by the agreement. In exchange, the operator agreed to operate the covered vessels in an "essential service" for 335 days per calendar year. Pursuant to Article I–2 of the ODS agreement, the essential service was defined as the "worldwide carriage of dry bulk cargoes in the foreign oceanborne commerce of the United States and in the carriage of such cargoes between foreign ports." (Complaint ¶ 25; Jt.Stip.Exh. # 91).

At the same time, the operator of the Texas Bulkers was restricted, under Article I–2, from engaging in certain shipping activities. For example, the bulkers were prohibited from carrying cargoes subject to the cargo preference statutes of the United States [5] (preference cargoes), which were normally only to be carried by unsubsidized U.S. vessels unless the agencies administering such statutes determined that a preference cargo would otherwise be allocated to a foreign flag vessel for carriage. Additionally, in Article II–25, the ODS agreement provided that the agreement could be modified or amended "by mutual consent" of the parties. (Complaint ¶ 31; Jt.Stip.Exh. # 91).

On June 14, 1979, a competitor of the plaintiffs, the Berger Group, was authorized by the MSB to operate, for a one-year experimental period, two subsidized tankers in the dry bulk preference trades while continuing to receive ODS. Shortly thereafter, on August 3, 1979, Equity Carriers applied to MarAd for an amendment to their ODS agreement. Specifically, they sought to modify the agreement so that the Texas Bulkers would be allowed to carry dry bulk preference cargoes. MarAd advised plaintiffs that no action would be taken on their application

until the end of the one-year trial period with the Berger Group.

Between 1981 and 1982, while the application was pending, the Pride of Texas, the Star of Texas, and the Spirit of Texas were completed and delivered by the shipbuilder. Meanwhile, in August of 1981, Congress enacted the Snyder Amendment, amending the Merchant Marine Act to allow subsidized vessels to elect to operate in the preference trades, provided that the operator agreed to have ODS payments suspended and further agreed to repay a portion of the CDS payments used in the construction of the vessel. By the end of 1982, each of the three plaintiffs in this matter, or their predecessors, had elected to operate pursuant to the Snyder Amendment.

During this time frame, the Berger Group had initiated litigation contesting the manner in which the MSB had rendered its determination of the rates they were to receive in the transport of preference cargoes pursuant to the MSB's 1979 authorization. On August 31, 1983, in response to a remand and order for reconsideration issued by the U.S. Court of Appeals for the District of Columbia Circuit, the MSB issued a tentative order allowing all six of the Berger Group vessels to carry dry bulk preference cargoes while continuing to receive ODS. The tentative order was adopted as a final opinion on December 23, 1983. In that final opinion, the MSB determined that the Snyder Amendment was not the exclusive means by which subsidized vessels could participate in the preference trades. *Aeron Marine Shipping Co. v. United States*, 695 F.2d 567 (1982).

As a consequence of these events, plaintiffs, on March 20, 1984, sought to revise their 1979 application for an amendment to the ODS agreement such that they could carry preference cargoes with ODS. In April and May of that year, the MSB gave permission for some subsidized vessel operators to carry military preference cargo without ODS.[6] Again, plaintiffs revised their ap-

---

delegated the authority vested in the Secretary of the DOT.

5. *See, e.g.,* 10 U.S.C. § 2631 (Supp. V 1993); 46 U.S.C.App. §§ 1241, 1241–1 (1988).

6. This decision did not explicitly relieve the plaintiffs of their statutory and contractual restrictions because it applied only to military preference cargo, rather than to the civilian dry bulk cargo carried by plaintiffs' vessels.

plication seeking, as a preferred alternative, to be allowed to carry civilian dry bulk preference cargo without ODS. On September 26, 1985, the MSB issued a tentative order granting plaintiffs their requested relief. The order was stayed pending a review of comments thereon, and on February 28, 1986, the MSB issued its final opinion relieving plaintiffs of their Snyder Amendment elections and permitting them to carry civilian dry bulk preference cargo without ODS. Plaintiffs' ODS agreement was amended accordingly shortly thereafter.

By a letter dated June 25, 1986, plaintiffs sought from MarAd the return of the payments they had made pursuant to the Snyder Amendment. Up to that date, plaintiffs had made Snyder Amendment payments in the following amounts: Asco, $1,473,452; Equity I, $2,686,549; and Equity III, $855,995. Plaintiffs filed their complaint in this court on April 13, 1987. Therein they seek damages from the United States in the amount of $5,015,996, the total of the payments made under the Snyder Amendment. Before the court at this time are defendant's motion to dismiss for failure to state a claim and the parties' cross-motions for summary judgment, which contain defendant's counterclaim.

## MOTION TO DISMISS[7]

### I. CONTENTIONS OF THE PARTIES

#### A. *DEFENDANT*

The crux of defendant's motion to dismiss is that plaintiffs' complaint does not rest upon any money-mandating provision of law, as required by the Tucker Act, 28 U.S.C. § 1491 (1988 & Supp. V 1993), and does not state a claim on any viable contract theory. As a result, the United States contends that the complaint should be dismissed for lack of subject matter jurisdiction or for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(1) & (4). In support of this contention, defendant first asserts that plaintiffs had no right to any amendment of their ODS contracts. The government cites the language of the contract in this connection, which provides in Article II–25 that the "Agreement *may* by mutual consent be terminated, modified, amended, or extended with respect to any subsidized vessel(s) or essential service(s) covered by this Agreement." (Jt.Stip. ¶ 49 & Exh. # 91 (emphasis added)). Furthermore, defendant maintains that it was not even required to take any action on plaintiffs' applications for amendment under the ODS contract. The government also claims that certain cases cited by plaintiffs, recognizing the duty not to hinder or delay another party in its contract performance, are inapplicable to the matter at bar because the government has done nothing to prevent plaintiffs from fulfilling their responsibilities under the ODS agreement. Second, the United States avers that its obligation of good faith rests solely on its express contractual duties and responsibilities under the ODS contract. Plaintiffs, defendant asserts, have failed to point to any contractual provision with respect to which the government has acted in bad faith. Moreover, the government argues that in order to show bad faith plaintiffs must adduce well-nigh irrefragable proof of bad faith and must show malice or an intent to injure plaintiffs on the part of the government. Defendant further charges that plaintiffs have failed to allege the malice required to prevail on a claim of bad faith. Finally, the United States alleges that plaintiffs can state or sustain no contract breach claim for disparate treatment of their amendment application because the ODS agreement contained no provision requiring or guaranteeing uniform treatment of all subsidized shippers. For all of these reasons, defendant believes the complaint must be dismissed.

#### B. *PLAINTIFFS*

Plaintiffs naturally contend that their complaint does state a proper claim under the jurisdiction of the court and, thus, that it should not be dismissed. In defense of their

---

7. In their complaint, plaintiffs put forth seven causes of action. However, in their opposition brief to defendant's motion to dismiss, plaintiffs state that the second, fifth, sixth, and seventh causes of action "may be dismissed" as they do not intend to pursue them. (Pltfs' Opp.Br. filed Feb. 26, 1992, at 9). Accordingly, we only consider plaintiffs' three remaining claims in our discussion and analysis.

position, they allege that defendant breached two principal contractual obligations. First, plaintiffs aver that the Board had a contractual duty to act upon their request for an amendment to the ODS agreement within a reasonable time. The law, plaintiffs assert, imposes an obligation to act within a reasonable time when no time for performance is specified in the contract. Plaintiffs allege that the government breached this obligation when it failed for six and one-half years to render a decision on their application for an amendment. Second, plaintiffs charge that the United States breached its implied obligation of good faith and fair dealing. Plaintiffs maintain that inaction can constitute a violation of the obligation of good faith. Further, they argue that while one need not show malice in order to prove a claim of unfair dealing, they have alleged in their complaint that defendant treated them unfairly, as a result of improper political motives, by expeditiously granting the applications of other similarly situated shippers. Therefore, plaintiffs conclude that their complaint states viable contract claims for both defendant's alleged failure to act within a reasonable time and for its alleged violation of the obligation of good faith and fair dealing.

## II. DISCUSSION

### A. *INTRODUCTION*

■ In briefing the motions now before the court, plaintiffs have made it clear that they are pursuing a contract claim by their complaint rather than trying to put forward a claim based on a provision of law which requires the payment of money damages. Specifically, the three shipping companies allege that the government owed them contractual duties under the ODS agreement to act within a reasonable time on their applications for amendments and to deal with them fairly and in good faith, which duties were breached, they contend, when defendant took over six years to approve their application and treated them differently than other operators similarly situated. Since, under the Tucker Act, 28 U.S.C. § 1491, the Court of Federal Claims has jurisdiction over claims founded on contracts with the United States, we

plainly have subject matter jurisdiction over plaintiffs' petition. Therefore, what remains to be considered, pursuant to defendant's motion to dismiss, is whether the complaint states a claim upon which relief can be granted.

■ When ruling on a motion to dismiss under RCFC 12(b)(4), our focus is limited to the facts alleged in the complaint, which must be presumed to be true and correct. *Reynolds v. Army and Air Force Exchange Service,* 846 F.2d 746, 747 (Fed.Cir.1988). Furthermore, the facts must be construed in the light most favorable to the non-movant (*i.e.,* plaintiffs). *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Our task is not to decide "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* Therefore, after a review of the factual allegations of the complaint, the petition should be dismissed for failure to state a claim only if no set of facts contained therein would, if proved, entitle plaintiffs to relief. *Mostowy v. United States,* 966 F.2d 668, 672 (Fed.Cir.1992). *See also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). With these guidelines in mind, we must now consider plaintiffs' complaint.

Plaintiffs advance two legal theories upon which they maintain they are entitled to recovery: (1) the duty to act within a reasonable time on their application to amend its ODS contract, and (2) the obligation of good faith and fair dealing. Additionally, plaintiffs allege two factual scenarios (or sets of facts) which they contend would entitle them to recovery on the merits under the aforementioned legal theories. First, they claim that the six and one-half year delay in approval of their application for an amendment to the ODS agreement constituted a breach of contract. Second, they charge that the disparate treatment accorded them by the MSB was also an actionable breach. Thus, given the foregoing allegations, this court must determine whether either set of facts, if proved, would, as a matter of law, entitle plaintiffs to recovery under either of their legal theories. If the preceding inquiry is answered in the negative, then the petition must be dis-

missed. In this light and against this background, we now examine the validity of plaintiffs' alleged contract claims.

### B. *DUTY TO ACT WITHIN A REASONABLE TIME*

Plaintiffs ask the court, in essence, to adopt their conclusion that the government had an unequivocal and obligatory duty to act upon their application for an amendment to the ODS agreement within a reasonable time. This conclusion, they contend, derives from the principle that the government, as a party to a contract, will be liable for its unreasonable delays. Plaintiffs adduce this principle from the holdings in various cases they cite. *E.g., B–E–C–K Constructors v. United States,* 571 F.2d 25, 215 Ct.Cl. 793 (1978); *Specialty Assembling & Packing Co. v. United States,* 355 F.2d 554, 174 Ct.Cl. 153 (1966); *Bruno Law v. United States,* 195 Ct.Cl. 370, 1971 WL 17828 (1971). Because, as will be shown, plaintiffs attempt to extract too broad a principle from the cases cited to, we reject their conclusion.

■ In *B–E–C–K Constructors,* the Court of Claims stated that:

It is well settled that where a time is not fixed in a contract for performance of an *obligation,* performance within a reasonable time, dependent on the circumstances applicable, is required. Where no time limit is given, it is presumed that performance will be concluded within a reasonable time.

571 F.2d at 31 (emphasis added). *See also Carroll v. United States,* 68 Ct.Cl. 500, 505–06, 1929 WL 2623 (1929) ("government liable in cases where it has caused damage by delay in complying with *its part of the contract.*" (emphasis added)). Plaintiffs argue that this precept implies that the United States, in the case at bar, had a contractual duty to act within a reasonable time on their applications. However, this is only true if

defendant had a contract duty to act on the applications at all. In other words, defendant only had a duty to render a decision within a reasonable time if it had an explicit *contractual obligation* to take some action on the applications.

■ Upon examining the language of the ODS contract, we are compelled to conclude, on this record, that the government did not have a contractual obligation of any nature to take any action with regard to plaintiffs' requests for contract amendments. Article II–25 of the ODS agreement, under which plaintiffs sought amendments, clearly provides only that the agreement "may by *mutual consent* be ... amended." (Complaint ¶ 31; Jt.Stip. ¶ 49 & Exh. # 91 (emphasis added)). This term, therefore, does not require any performance on the part of either party. Defendant is not unilaterally required, under Article II–25, to consider requests for amendments or to render decisions thereon.[8] Therefore, because the MSB did not have either an explicit or an implied contractual obligation to act upon plaintiffs' applications, it follows that the Board did not have a duty to act at all upon those applications, not even within a reasonable time, based on the principle enunciated in *B–E–C–K, supra.*

Plaintiffs also rely on the decision of the Court of Claims in *Specialty Assembling,* 355 F.2d 554, 174 Ct.Cl. 153 (1966). In that case, a government contractor brought suit for delays it experienced that were caused by the United States. Among its claims, plaintiff argued that the Army Signal Corps had delayed unreasonably in approving the use of nonstandard components in constructing radio direction finders. Because the Signal Corps was *required* therein to act on requests for approval of nonstandard components, the court held that it was obliged to do so within a reasonable time. *Id.* at 565. Furthermore, it is significant that, in *Specialty Assembling,* plaintiff was seeking damages

---

**8.** Under Article II–24, an operator may be allowed to withdraw from the ODS agreement upon making a showing to the government that it is unable to operate in the essential service with a reasonable profit. (Jt.Stip.Exh. # 91). However, plaintiffs do not allege that they ever attempted to proceed under this article, nor do they allege that they attempted to make the showing required under Article II–24. Accordingly, we consider the obligations of the government under Article II–25, the provision pursuant to which plaintiffs aver that they sought contract amendments.

for the delay it experienced in carrying out its *contractual* performance. Thus, *Specialty Assembling* fits squarely within the "longstanding rule in this court that every Government contract contains an implied provision whereby the parties agree not to hinder or unreasonably delay the other party's performance." *O'Neill v. United States*, 231 Ct.Cl. 823, 824, 1982 WL 25241 (1982). *See also Sun Oil Co. v. United States*, 572 F.2d 786, 801, 215 Ct.Cl. 716 (1978).

Similarly, in *Bruno Law*, 195 Ct.Cl. at 399, the Court of Claims found "an implied obligation not to cause unreasonable delay in making permitted changes in the contract." Plaintiffs, in the present matter, cite that case arguing that the MSB had an obligation not to cause unreasonable delay in rendering a decision on their applications for amendments to their ODS contract. We note that plaintiffs studiously avoid addressing the threshold issue of establishing first an explicit contractual duty on the defendant to act in the first place. However, *Bruno Law* is inapposite to the case at bar because there the plaintiff was seeking compensation for the delay caused in the completion of *its* performance under the contract. Thus, the holding in *Bruno Law*, like that in *Specialty Assembling*, was premised on the general proposition that "[t]he government must avoid actions that unreasonably cause delay or hindrance to contract performance." *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed.Cir.1993) (quoted in *Howard v. United States*, 31 Fed.Cl. 297, 309 (1994)).

■ Therefore, in the case at bar, plaintiffs would be entitled to offer probative evidence in support of their claim if they had alleged that their required contractual performance under the ODS agreement was delayed or hindered by the failure of the government to render a prompt decision on their request for an amendment. Plaintiffs have made no such allegation in their complaint. Under the ODS agreement, the primary obligation required of plaintiffs is that they carry dry bulk cargo in the foreign oceanborne commerce of the United States (known as the "essential service") for 335 days out of the year. (Complaint ¶ 25; Jt.Stip. ¶ 48 & Exh.

# 91). The facts alleged in the complaint do not suggest that the plaintiffs' shipping companies were delayed or hindered in operating in the "essential service." While such operation may not have been as profitable as plaintiffs might have liked, they have not alleged that they were hindered from operating in such service. Consequently, we hold that plaintiffs have failed to state a claim based on the implied obligation of the government not to unreasonably delay or hinder their contract performance.

■ In sum, the applicable precedent establishes that: (1) the government will be liable when it delays unreasonably in performing its *own obligations* and duties under a contract; and (2) the government will be liable when it unreasonably causes delay or hindrance to the performance of the other party's contractual obligations. Neither of these principles is broad enough to establish liability in the government based on the facts alleged in the complaint. Plaintiffs have not alleged facts from which we could find that the MSB had a contractual obligation to act upon their requests for amendments to the ODS agreement, nor have they alleged facts which, if proved, would establish that they were delayed or hindered in carrying out their part of the bargain under the ODS contract. Accordingly, to the extent that they contend that defendant had a duty to act within a reasonable time on their applications for an amendment, plaintiffs have failed to state a claim upon which relief can be granted. Given all of the foregoing, we hold that plaintiffs have failed to state a claim based on the implied obligation of the government not to unreasonably delay or hinder their contract performance.

## C. *OBLIGATION OF GOOD FAITH AND FAIR DEALING*

Plaintiffs also allege that the government breached its ODS contract with them by failing to uphold its obligation of good faith and fair dealing. Specifically, they contend that this obligation was breached when the MSB failed to act in a timely manner on their application for a contract amendment and when it expeditiously granted virtually iden-

tical amendments to plaintiff's similarly situated competitors.

> At the outset, we observe that the obligation of good faith and fair dealing is a covenant which is implied in this and every contract. *Travelers Indemnity Co. v. United States,* 16 Cl.Ct. 142, 149 (1988), *citing Tymeshare, Inc. v. Covell,* 727 F.2d 1145, 1152 (D.C.Cir.1984); Williston, *A Treatise on the Law of Contracts,* § 670 (3d ed. 1961). Thus, the government has an ever present obligation to perform its *duties* under a contract reasonably and in good faith. *Commerce International Co., Inc. v. United States,* 338 F.2d 81, 167 Ct.Cl. 529, 536 (1964).

*Asco–Falcon,* 18 Cl.Ct. at 491–92 (emphasis added).

■ However, it is well-settled that government officials are *presumed* to act conscientiously and in good faith in the discharge of their duties. *Spezzaferro v. Federal Aviation Admin.,* 807 F.2d 169, 173 (Fed. Cir.1986); *Torncello v. United States,* 681 F.2d 756, 770, 231 Ct.Cl. 20 (1982); *Kalvar Corp. v. United States,* 543 F.2d 1298, 1301, 211 Ct.Cl. 192 (1976). Thus, in order for this court to find that defendant breached its *duty* of good faith, plaintiffs must *allege and prove,* by clear and strong evidence, specific acts of bad faith on the part of the government. *Continental Collection & Disposal, Inc. v. United States,* 29 Fed.Cl. 644, 652 (1993). Indeed, "[i]t requires 'well nigh irrefragable proof' to induce the court to abandon the presumption of good faith dealing." *Id.* (citing *Kalvar,* 543 F.2d at 1301–02).

■ As the predecessor Court of Claims has stated, "[s]ince good faith is presumed unless bad faith is shown, the government is prevented only from engaging in actions motivated by a specific intent to harm plaintiff." *Torncello,* 681 F.2d at 771. *See also Kalvar,* 543 F.2d at 1302 (" '[I]rrefragable proof' has been equated with evidence of some *specific intent to injure the plaintiff.* "). Thus, in order to state a claim premised on a violation of the obligation of good faith and fair dealing, plaintiffs must allege facts which if proved would constitute malice or an intent to injure. *See Continental,* 29 Fed.Cl. at 651–52; *Librach v. United States,* 147 Ct.Cl.

605, 614, 1959 WL 7633 (1959). *See also Harris Systems Int'l, Inc. v. United States,* 5 Cl.Ct. 253, 263 (1984).

■ As evidence of defendant's bad faith and unfair dealing, plaintiffs first point to the alleged six and one-half year delay by the MSB in approving their request for a contract amendment. However, even if this was proven, plaintiffs would not have shown by such fact one scintilla of proof of a specific act of bad faith or malice, nor any intent to injure plaintiffs, on the part of the government. Absent such a showing, plaintiffs would be unable to overcome the presumption of good faith dealing that attaches in favor of the government.

■ Second, plaintiffs contend that the alleged discriminatory and disparate treatment they received from the MSB, specifically that the Board refused to act on their application while granting similar amendments to other similarly situated shippers, constituted an actionable breach of the obligation of good faith and fair dealing. In *Oceanic Steamship Company v. United States,* 586 F.2d 774, 788, 218 Ct.Cl. 87 (1978), the Court of Claims' pronouncement, we believe, emphatically rejects that contention as follows:

> Even where two operators are identically situated, differing treatment of them will not *automatically* entitle the one less generously treated to judicial intervention . . . [N]either the statute nor the contract requires absolutely equal treatment . . . Of course, disparate treatment of similarly situated subsidized operators will invite close scrutiny by this court, which will be vigilant to see that the Maritime Administration complies with . . . its contractual obligations. But we cannot say that a claim for relief is automatically established when one operator shows merely that another operator was treated differently.

(emphasis in original). Thus, plaintiffs' bland allegation of disparate treatment does not, *ipso facto,* state an actionable claim. Plaintiffs must show a breach of a *contractual* obligation. Bad faith on the part of the government would constitute a breach of a contractual obligation. However, alleged dis-

parate treatment, absent an allegation of malice or intent to harm, is insufficient to state a claim based on bad faith.

In their complaint, plaintiffs allege that "defendant's unjustified disparate and discriminatory treatment of the plaintiffs was actuated by political motives and other motives not legally permissible for official actions." (Complaint ¶ 75). While factual allegations must be presumed to be true when evaluating a motion to dismiss, "conclusory allegations without any supporting facts are insufficient to withstand a motion to dismiss." *Hanson v. United States*, 13 Cl.Ct. 519, 530 (1987) (citing *Briscoe v. LaHue*, 663 F.2d 713 (7th Cir.1981)). It is clear that plaintiffs' allegation of "legally impermissible motives" is a mere legal conclusion, rather than a factual allegation, and need not be accorded the presumption of truth. Moreover, the assertion that the defendant was "actuated by political motives" is also highly conclusory and is unsubstantiated by any of the facts alleged in the complaint. Consequently, we are constrained to hold that plaintiffs' complaint consists of a mere "conclusory allegation" of political motivation "without any supporting facts." Without any facts to support their claim of bad faith, therefore, plaintiffs cannot withstand the motion to dismiss for failure to state a claim.

However, even treating this allegation as factual and merely assuming it to be true, we must still consider whether, after having established political motives for the Board's alleged disparate treatment, plaintiffs would be entitled to relief under a theory of bad faith and unfair dealing. Plaintiffs have not alleged any facts from which we could reasonably infer that defendant had a specific intent to harm them. "To demonstrate bad faith, specific instances of the government's ill will directed toward the plaintiff must be identified." *Continental*, 29 Fed.Cl. at 652. In the case at bar, plaintiffs have failed to identify in their complaint any specific instance of bad faith or ill will. None of the facts contained therein, even when construed in the light most favorable to the plaintiffs, constitute malice or an intent to injure the plaintiffs on the part of the government. Being motivated by political con-

siderations is not the same thing as being motivated by an intent to harm or injure the plaintiffs. Political motivation without more will not support a finding of bad faith. Since a finding of bad faith is tantamount to a finding of malice, based on the facts alleged in the complaint, we could not find that the government had breached its obligation of good faith and fair dealing. Therefore, plaintiffs have failed to state a claim for breach of the obligation of good faith and fair dealing.

## III. CONCLUSION

Upon reviewing the complaint, we are unable to find any set of facts alleged therein which, if proved, would entitle plaintiffs to relief. *Mostowy v. United States, supra; Conley v. Gibson, supra.* Thus, plaintiffs have failed to state a claim upon which relief can be granted. Accordingly, defendant's motion to dismiss is hereby GRANTED and the plaintiffs' petition is accordingly dismissed. Concomitantly, plaintiffs' motion for summary judgment is, thus, hereby DENIED.

## DEFENDANT'S COUNTERCLAIM

Having dismissed plaintiffs' claim, we are still left with defendant's counterclaim, with respect to which it moves for summary judgment. The Court of Federal Claims has jurisdiction over the counterclaim pursuant to 28 U.S.C. § 1503 (Supp. V 1993), which grants the court jurisdiction to render judgment on any set-off or demand against any plaintiff. The fact that the complaint was dismissed for failure to state a claim, therefore, does not divest the court of jurisdiction over the counterclaim at bar. *American Nat'l Bank and Trust Co. v. United States*, 23 Cl.Ct. 542, 544 n. 2 (1991); *Joseph Morton Co. v. United States*, 3 Cl.Ct. 780, 783 (1983), *aff'd*, 757 F.2d 1273 (Fed.Cir. 1985). *See also Astro–Space Lab, Inc. v. United States*, 470 F.2d 1003, 1020, 200 Ct. Cl. 282 (1972) (dismissal of plaintiff's petition "withheld until final disposition of defendant's counterclaim."). Therefore, we now consider the contentions of the parties in connection with defendant's motion for summary judgment on the counterclaim.

## I. CONTENTIONS OF THE PARTIES

### A. *DEFENDANT*

Defendant contends, quite simply, that the plaintiffs were required, under the Snyder Amendment, 46 U.S.C.App. § 1184, and their agreements electing to operate thereunder, to make repayments to the government equal to a portion of the CDS received in construction of the vessels, as a matter of law. Furthermore, the government avers that there are no genuine issues of material facts concerning plaintiffs election to suspend the ODS contract and proceed pursuant to the Snyder Amendment. Finally, defendant adds that the reinstatement agreement, by which the plaintiffs ended the suspension of their ODS agreement, provides no legal basis to relieve plaintiffs of their obligations to make payment of any monies still owed from the time when they were operating under the Snyder Amendment. Therefore, the United States concludes that it is entitled to summary judgment on its counterclaim.

### B. *PLAINTIFFS*

In response to defendant's argument in favor of summary judgment on the counterclaim, plaintiffs maintain that their damages for the alleged breach of contract by the government are exactly equal to the total Snyder Amendment payments they were required to make. Thus, they assert that, if they are found liable for outstanding debts owed under the Snyder Amendment, they will be entitled to damages from defendant in the additional amount of such liability. Plaintiffs then argue from this premise, therefore, that they are entitled to a set-off equal to the amount of any liability they may have on the counterclaim.[9]

## II. DISCUSSION

### A. *INTRODUCTION*

 Summary judgment is appropriate under RCFC 56 if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Furthermore, "[a] summary judgment inter-

locutory in character may be granted on the issue of liability alone although there is a genuine issue as to the amount of damages." RCFC 56(c). The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden may be discharged by the moving party by "pointing out ... that *there is an absence of evidence to support the non-moving party's case." Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,* 833 F.2d 1560, 1563 (Fed.Cir.1987) (emphasis added). Then, the burden falls to the non-movant who must adduce evidence demonstrating that there is indeed a genuine issue of material fact for trial. *Beauchamp Constr. Co., Inc. v. United States,* 14 Cl.Ct. 430, 435 (1988). Finally, we note that the evidence and all factual inferences must be viewed in the light most favorable to the opposing party. *Confederated Tribes of the Colville Res. v. United States,* 20 Cl.Ct. 31, 38 (1990).

Normally, our analysis would proceed first to the determination of whether there are any genuine issues of fact for trial. However, in the case at bar, the parties have filed Joint Stipulations of Uncontroverted Facts. Thus, with regard to the material facts contained therein, there are no genuine issues since both parties accept them as true. As a result, the court may proceed directly to evaluate whether on the stipulated facts defendant is entitled to summary judgment as a matter of law.

### B. *ANALYSIS*

The Snyder Amendment provides, in relevant part, that:

Any operator receiving operating differential subsidy funds may elect, for all or a portion of its ships, to suspend its operating differential subsidy contract with all attendant statutory and contractual restrictions ... if ... the owner agrees to pay the Secretary, upon such terms and conditions as he may prescribe, an amount

---

**9.** Inasmuch as plaintiffs' argument presupposes the defendant's liability for contract damages, our dismissal of the petition for failure to state a claim divests said argument of any vitality. Therefore, we do not address plaintiffs' argument in our discussion below.

which bears the same proportion to the construction differential subsidy paid by the Secretary as the portion of the suspension period during which the vessel is operated in any preference trade from which a subsidized vessel would otherwise be excluded by law or contract bears to the entire economic life of the vessel.

46 U.S.C.App. § 1184. Thus, under the amendment, an operator may have its ODS agreement suspended, thereby allowing it to participate in the carriage of preference cargoes. In exchange for this right, an operator who makes an election to operate pursuant to the amendment must also agree to make payments to the government equal to the fraction of the CDS funds used to construct the vessel that the time spent in preference trades bears to the economic life of the vessel.

It is undisputed that each of the three plaintiff shipping companies at bar elected to suspend their ODS contract and operate their respective vessels pursuant to the Snyder Amendment. Equity I elected to operate under the amendment commencing September 21, 1981; Asco elected to do the same on December 4, 1981; and Equity III's predecessors made a Snyder Amendment election on November 30, 1982. Furthermore, it is also undisputed that, by their elections to suspend the ODS contract, each plaintiff (or its predecessors in interest) agreed to make the CDS repayments necessary to satisfy the requirements of the Snyder Amendment. Indeed, plaintiffs actually made the required payments during much of the time the ODS contract was suspended. Finally, the parties have stipulated that all three vessels at issue in this matter were operated pursuant to the amendment until April 15, 1986.

From the foregoing, it follows that plaintiffs were required by law, as well as by the agreements into which they entered, electing to operate pursuant to the amendment, to make payments to the government for the time in which they participated in the preference trades while the ODS contract was suspended. While the parties have stipulated that the plaintiffs did make some Snyder Amendment payments to the Board, to the extent that any outstanding amounts are owed by plaintiffs for carrying preference cargoes, they are liable under the Snyder Amendment.

### III. CONCLUSION

Because the parties have stipulated to the operative facts in this matter, there are no genuine issues of material facts present. Based on the stipulated facts, therefore, this court concludes that defendant is entitled to judgment as a matter of law on the issue of plaintiffs' liability on the counterclaim. Therefore, we find that plaintiffs, the shipping companies, are liable to defendant for such amounts owed for their operation pursuant to the Snyder Amendment that have not yet been paid. Those amounts are set forth in a joint stipulation filed in this court on November 7, 1991, as follows:

| Stipulation | Entity | Amount |
|---|---|---|
| 111 | Equity Carriers I | $ 53,171.79 |
| 112 | Equity Carriers III | 1,137,296.99 |
| 113 | Asco–Falcon II | 1,185,124.79 |
| Total Stipulated Damages Due Defendant on its Counterclaim | | $2,375,593.57. |

To confirm this amount as the proper damages due on the counterclaim, the court held a status conference in open court on Tuesday, December 20, 1994. At that time, both parties agreed that the foregoing total amount is the amount of damages to which defendant is entitled on a favorable judgment on its counterclaim.

### CONCLUSION

For all of the foregoing reasons, defendant's motion to dismiss is hereby GRANTED, and plaintiffs' motion for summary judgment is, therefore, hereby DENIED. Finally, on the counterclaim, defendant's motion for summary judgment is GRANTED on the issue of liability. The Clerk shall, therefore, enter judgment in favor of the defendant on its counterclaim in the total amount of $2,375,593.57. Costs shall be awarded to defendant against plaintiffs.

IT IS SO ORDERED.